**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

JANICE E. MASCIANTONIO, et al.,

|                          |   |                                          |
|--------------------------|---|------------------------------------------|
| Plaintiffs,              |   | CIVIL ACTION NO. 4:13-CV-00797           |
| v.                       |   | (CONNER, C.J.)                           |
| SWEPI LP,                |   | (MEHALCHICK, M.J.)                       |
| Defendant.               |   |                                          |

## REPORT AND RECOMMENDATION

This is a breach of contract action, brought before this Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332. The matter is now before the Court upon the Defendant's Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim. (Doc. 6). For the reasons stated herein, it is recommended that the Defendant's motion be **DENIED**.

## I.   BACKGROUND

The Plaintiffs in this case are (a) Janice E. Masciantonio and Martin J. Masciantonio, husband and wife, and (b) Paul R. Latshaw and Paul B. Latshaw, father and son co-trustees of the Phyllis E. Latshaw Residuary Trust. Together the Plaintiffs jointly own two parcels of land in Jackson Township, Lycoming County. The Plaintiffs are all residents of Pennsylvania.

The Defendant in this case is SWEPI LP, a Delaware limited partnership with its principal place of business in Houston, Texas. The complaint does not specifically allege the citizenship of SWEPI for diversity jurisdiction purposes, but none of its constituent partners appears to be a citizen of Pennsylvania. *See* Notice of Removal ¶¶ 6–8, *Messner v. SWEPI, LP, No. 4:13-CV-00014 (M.D. Pa. filed Jan. 3, 2013) (Doc. 5).*

According to the complaint, in late 2011, the Plaintiffs entertained two financially

similar offers to lease oil and gas rights with respect to their Lycoming County property, one

from Andarko E&P Company, LP, and the other from SWEPI. On November 5, 2011, the

Plaintiffs accepted SWEPI's offer and each pair of plaintiffs executed a substantively identical

lease. (Doc. 1-2; Doc. 1-3).

In essence, the SWEPI lease provided for each set of plaintiffs to receive a 15% net

royalty on any oil or gas production from the property and bonus consideration in the amount

of $4,000 per net mineral acre. The royalty was set forth in paragraph 4 of the lease. Both leases

included an identical lease addendum, paragraph 22 of which set forth the bonus consideration.

Paragraph 22 provided as follows:

> In consideration for the attached paid-up Oil and Gas Lease, Lessee hereby
> agrees to pay Lessor: *FOUR THOUSAND* and 00/100 dollars ($*4000*.00) per net
> mineral acre. Payment shall be due within ninety (90) banking days of the Lessor
> presenting the Bank Draft to the financial institution of his/her/their choosing.
> All payment obligations are subject to title verification by Lessee. Said title
> verification shall be completed within the aforementioned ninety (90) banking
> day period.
>
> (Doc. 1-2, at 9; Doc. 1-3, at 9).

The leases also each contained an identical surrender provision:

> Lessee at any time, and from time to time, may surrender this lease as to all or
> any part thereof by recording an appropriate instrument of surrender in the
> proper county and thereupon this lease and the rights, rentals and obligations of
> the parties hereunder shall terminate as to the part so surrendered....
>
> (Doc. 1-2, at 2; Doc. 1-3, at 2).

The Plaintiffs also executed substantively identical memoranda of lease, which SWEPI

subsequently recorded with the Lycoming County Recorder of Deeds. (Doc. 1-4; Doc. 1-5). The

Masciantonio memorandum of lease was recorded on November 11, 2011. (Doc. 1-4). The

Latshaw memorandum of lease was recorded on January 10, 2012. (Doc. 1-5). The leases

themselves were not recorded.

The acreage on the leases was originally listed as 1,036 acres. Prior to executing the leases, the Plaintiffs provided SWEPI with a recent survey and the parties agreed to adjust the acreage upward to reflect the surveyed acreage of 1,144 acres, which was done by handwritten amendment to the preprinted leases. The bonus consideration due to each set of plaintiffs under each of the leases was therefore Two Million Two Hundred Eighty-Eight Thousand Dollars ($2,288,000.00).

On November 17, 2011, SWEPI tendered a "payable through" draft[1] in the amount of $2,288,000.00 payable to Janice and Martin Masciantonio. (Doc. 1-6). The draft designated Amegy Bank N.A. as the collecting bank, and it further provided that payment of the draft was due ninety banking days after its receipt by the collecting bank for presentment, during which time any title examination would be completed. (Doc. 1-6). The Masciantonios delivered the draft to their bank, Univest Bank & Trust Co., for collection, and Univest forwarded the draft to Amegy for presentment. On December 1, 2011, Amegy sent a domestic collection letter to the Masciantonios, acknowledging receipt of the draft and advising them that settlement under the terms of the draft was due on April 11, 2012. (Doc. 1-7).

On December 29, 2011, SWEPI tendered a "payable through" draft in the amount of $2,288,000.00 payable to the Latshaw Residuary Trust. (Doc. 1-8). The draft was otherwise identical to the one issued to the Masciantonios. The Trustees delivered the draft to their bank, Univest, for collection, and Univest forwarded the draft to Amegy for presentment. On January

---

[1] Under the Uniform Commercial Code, as adopted by Pennsylvania, "[i]f an item states that it is 'payable through' a bank identified in the item, the item designates the bank as a collecting bank and does not by itself authorize the bank to pay the item, and the item may be presented for payment only by or through the bank." 13 Pa. Cons. Stat. § 4106(a) & cmt. 1 (1990).

8, 2014, Amegy sent a domestic collection letter to the Trustees, acknowledging receipt of the draft and advising them that settlement under the terms of the draft was due on May 24, 2012. (*See* Doc. 1-12).[2]

On January 23, 2012, at SWEPI's request, the Plaintiffs agreed to revise the leased acreage downward to match the original assessed acreage of 1,036 acres, which was accomplished by the execution of an Amendment and Correction to Oil and Gas Lease with respect to each lease. (Doc. 1-9; Doc. 1-11). These written amendments were subsequently recorded by the Lycoming County Recorder of Deeds on April 3, 2012. (Doc. 1-9; Doc. 1-11).

On January 23, 2012, SWEPI tendered a new "payable through" draft in the amount of Two Million Seventy-Two Thousand Dollars ($2,072,000.00) payable to the Latshaw Residuary Trust. (Doc. 1-15). The draft was otherwise identical to the one previously tendered to the Trust. The Trustees delivered this second draft to their bank, Univest, for collection, and Univest forwarded it to Amegy for presentment. On January 30, 2012, Amegy sent a domestic collection letter to the Trustees, acknowledging receipt of the second draft and advising them that settlement under the terms of this draft was due on June 6, 2012. (Doc. 1-16).

On January 27, 2012, SWEPI tendered a new "payable through" draft in the amount of $2,072,000.00 payable to Janice and Martin Masciantonio. (Doc. 1-13). The draft was otherwise identical to the one previously tendered to the Masciantonios. The Masciantonios delivered this second draft to their bank, Univest, for collection, and Univest forwarded it to Amegy for presentment. On January 30, 2012, Amegy sent a domestic collection letter to the

---

[2] The first Latshaw domestic collection letter is not attached to the complaint, but the relevant dates may be ascertained from the subsequent returned domestic collection letter.

Trustees, acknowledging receipt of the second draft and advising them that settlement under the terms of this draft was due on June 6, 2012. (Doc. 1-14).

At the Plaintiffs' request, on a date not specified in the complaint, SWEPI agreed to revise the date of issuance for both replacement drafts to November 5, 2011, the date when the leases were originally executed. (Doc. 1 ¶¶ 39, 43; Doc. 1-13; Doc. 1-15).

On March 29, 2012, Amegy sent a returned domestic collection letter to the Masciantonios, advising them that the original draft tendered on November 17, 2011, was being returned unpaid because it had been replaced by a new draft, referencing the second draft tendered by SWEPI on January 27, 2012. (Doc. 1-10). On April 16, 2012, Amegy sent returned domestic collection letters to both sets of plaintiffs, advising them that the second draft tendered to each in January 2012 was being returned unpaid because the underlying leases had been surrendered "per the land department." (Doc. 1-17; Doc. 1-18). On April 17, 2012, Amegy Bank sent a returned domestic collection letter to the Trustees, advising them that the original draft tendered on December 29, 2011, was being returned unpaid because the underlying lease had been surrendered. (Doc. 1-12).

On May 7, 2012, SWEPI provided each set of plaintiffs with a copy of a Surrender and Cancellation of Lease dated April 16, 2012, and recorded by the Lycoming County Recorder of Deeds on May 4, 2012. These documents are described in the complaint but copies are not attached. (Doc. 1 ¶¶ 47, 50).

On March 27, 2013, the Plaintiffs filed the complaint in this action, asserting a single count of breach of contract against SWEPI, and requesting compensatory damages to the Masciantonios and the Latshaw Residuary Trust in the amount of $2,072,000.00 each. (Doc. 1). On May 20, 2013, SWEPI filed a motion to dismiss the complaint pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, together with a brief in support of the motion. (Doc. 6; Doc. 7). On June 20, 2013, the Plaintiffs filed their brief in opposition to the motion to dismiss. (Doc. 10). On July 15, 2013, SWEPI filed a reply brief. (Doc. 13).

On January 15, 2014, counsel of record appeared before the Court for oral argument on the motion. At the close of argument, the Court asked both sides to submit supplemental letter briefs addressing recent case law discussed at the hearing but not cited in the parties' briefs. The parties submitted their supplemental briefs on January 21, 2014. (Doc. 18; Doc. 19).

On February 6, 2014, the undersigned magistrate judge issued a report and recommendation on SWEPI's motion. (Doc. 20). The undersigned found that both parties had advanced reasonable alternative interpretations of the bonus provision in the lease agreements, and therefore the bonus provision is ambiguous. Moreover, under the Plaintiffs' interpretation of this provision, SWEPI's obligation to pay the specified bonus consideration was not extinguished by surrender of the leases, and it thus remained potentially liable for breach of contract. Accordingly, the undersigned recommended that SWEPI's motion to dismiss for failure to state a claim be denied.

On February 20, 2014, SWEPI filed objections to the report and recommendation, together with a brief in support of its objections. (Doc. 22; Doc. 23). Generally, SWEPI objected to the undersigned magistrate judge's reliance on legal theories not specifically advanced by the parties in their briefs. On March 13, 2014, the presiding district judge found no error in the magistrate judge's analysis, but nevertheless declined to adopt the February 6th report and recommendation, instead remanding it to permit the parties an opportunity to fully and fairly advocate their positions before the undersigned magistrate judge. (Doc. 24).

The parties were ordered to submit supplemental briefs, addressing the substantive arguments raised by SWEPI in its objections, and each was permitted to file a reply brief in response to the supplemental brief filed by the other side. (Doc. 25; Doc. 27). On March 27, 2014, each side filed a supplemental brief on SWEPI's motion to dismiss. (Doc. 28; Doc. 29). On April 4, 2014, SWEPI filed a reply brief. (Doc. 30).

The motion is once again ripe for a decision.

## II.  MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). Although the Court must accept the allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).

Under Rule 12(b)(6), the defendant has the burden of showing that no claim has been stated. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *Johnsrud v. Carter*, 620 F.2d 29, 32–33 (3d Cir. 1980); *Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 495 (M.D. Pa. 2005). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

551 U.S. 308, 322 (2007).[3]

## III. DISCUSSION

The Plaintiffs have asserted a single count of breach of contract against SWEPI, claiming that the Defendant was obligated under the terms of the two leases to pay bonus consideration to the Masciantonios and the Latshaw Residuary Trust in the amount of $2,072,000.00 each. SWEPI has moved to dismiss for failure to state a claim upon which relief can be granted, relying on two provisions of the identical leases: (a) the surrender clause in paragraph 10 of each lease permitting SWEPI to surrender the lease at any time and immediately extinguish any obligation not already accrued; and (b) the bonus consideration provision in paragraph 22 of the addendum to each lease, under which SWEPI contends its obligation to pay the bonus consideration did not accrue until ninety banking days after the Plaintiffs presented their drafts to their bank for collection. SWEPI argues that it surrendered

---

[3] In addition to the complaint in this matter (Doc. 1), the Court has considered the various exhibits attached to it, which include the parties' oil and gas leases (Doc. 1-2; Doc. 1-3), recorded memoranda of the leases (Doc. 1-4; Doc. 1-5), recorded amendments to the leases (Doc. 1-9; Doc. 1-11), bonus drafts (Doc. 1-6; Doc. 1-8; Doc. 1-13; Doc. 1-15); and domestic collection letters (Doc. 1-7; Doc. 1-10; Doc. 1-12; Doc. 1-14; Doc. 1-16; Doc. 1-17; Doc. 1-18). With respect to the Court's threshold determination whether the lease agreements at issue in this case contained an ambiguity, however, the Court has not considered the content of the bonus drafts or other subsequently created documents. Although under Pennsylvania law separate writings should be construed together if they are executed at the same time as part of the same transaction, the bonus drafts in this case were not tendered contemporaneously with the execution of the leases. *See Kropa v. Cabot Oil & Gas Corp.*, 609 F. Supp. 2d 372, 376–77 (M.D. Pa. 2009) (construing an oil and gas lease); *Int'l Milling Co. v. Hachmeister, Inc.*, 110 A.2d 186, 191 (Pa. 1955). Both leases were executed on November 5, 2011. The original bonus drafts were not tendered to the Masciantonios until nearly two weeks later, nor to the Latshaws until nearly *two months* later. The replacement bonus drafts were not tendered to the Plaintiffs until late January 2012, nearly three months after the leases were executed.

The Court has also considered various treatises, journal articles, and industry presentations with respect to usage of the term "bank draft" in the oil and gas industry.

both leases before the ninety banking day period expired, thus any promise to pay bonus consideration was extinguished upon surrender of each lease, prior to accrual.

## A. APPLICABLE PRINCIPLES OF CONTRACT LAW

Under Pennsylvania law, an oil and gas lease "is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.2d 261, 267 (Pa. 2012); *see also Stewart v. SWEPI, LP*, 918 F. Supp. 2d 333, 339 (M.D. Pa. 2013) (Conner, J.); *Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 772 (W.D. Pa. 2004).[4] "It must be construed in accordance with the terms of the agreement as manifestly expressed, and the accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." *T.W. Phillips*, 42 A.3d at 267 (internal quotation marks and brackets omitted); *see also Stewart*, 918 F. Supp. 2d at 339. Ultimately, "[t]he burden of proof is borne by the party seeking to terminate the lease." *Stewart*, 918 F. Supp. 2d at 339; *see also T.W. Phillips*, 42 A.3d at 267.

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only when a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not

---

[4] This Court must apply relevant state law when its jurisdiction is based on the parties' diversity of citizenship. *Linder v. SWEPI, LP*, 549 Fed. App'x 104, 107 (3d Cir. 2013) (construing an oil and gas lease).

resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Great Am. Ins. Co. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (quoting *Murphy v. Duquesne Univ.*, 777 A.2d 418, 429–30 (Pa. 2001)); *see also Butters Living Trust v. SWEPI, LP*, No. 4:12-cv-02010, 2013 WL 3679533, at *3 (M.D. Pa. July 12, 2013) (construing oil and gas lease).

Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted by the Court as a matter of law. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980). [5]

"The threshold determination of whether a writing is 'ambiguous' necessarily lies with the court." *Ready Food Prods., Inc. v. Great Northern Ins. Co.*, 612 A.2d 1385, 1387 (Pa. Super. Ct. 1992); *see also Mellon Bank*, 619 F.2d at 1011; *Jacobs*, 332 F. Supp. 2d at 773. In reviewing the leases for ambiguity, several additional maxims must be kept in mind. The Court "must read the contractual provisions to avoid ambiguities if possible." *Great Am. Ins.*, 544 F.3d at 247 (citing *Masters v. Celina Mut. Ins. Co.*, 224 A.2d 774, 776 (Pa. Super. Ct. 1966)). "[S]pecific provisions ordinarily control more general provisions." *Great Am. Ins.*, 544 F.3d at 247 (*citing In re Alloy Mfg. Co. Employees Trust*, 192 A.2d 394, 396 (1963)). "When a contract contains either hand or typewritten terms which are in conflict with the preprinted terms, the pre-printed terms must always yield to the other terms because the hand or typewritten term presumably evidences the deliberate expression of the parties' true intent." *Butters Living Trust*, 2013 WL

---

[5] If a writing is not ambiguous, it is appropriate for a district court to resolve the issue of contract interpretation as a matter of law, but typically on summary judgment rather than a motion to dismiss. *See Butters Living Trust*, 2013 WL 3679533, at *4.

3679533, at *3 (quoting *Flatley ex rel. Flatley v. Penman*, 632 A.2d 1342, 1345 (Pa. Super. Ct. 1993)). "Trade terms, legal terms of art, numbers, common words of accepted usage and terms of a similar nature should be interpreted in accord with their specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent." *Mellon Bank*, 619 F.2d at 1013. Ultimately, however, the bottom line remains: "If the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

### B. THE PROVISIONS IN DISPUTE

"Oil and gas leases utilize some terms unique to leases of their genre." *Burlew v. Talisman Energy USA Inc.*, 940 N.Y.S.2d 781, 786 (N.Y. Sup. Ct. Feb. 15, 2011). One such term is the term "bonus," which in this context is the payment of a fixed amount of money in consideration for the lessor's execution of the lease, as distinguished from periodic rents or royalty payments that may become due throughout the term of the lease. *See Enerquest Oil & Gas, LLC v. Plains Exploration & Prod. Co.*, 981 F. Supp. 2d 575, 602 (W.D. Tex. 2013); *Burlew*, 940 N.Y.S.2d at 786; *Elsinore Oil Co. v. Signal Oil & Gas Co.*, 40 P.2d 523, 524 (Cal. Ct. App. 1935). Generally, "[a] bonus may be paid 'either in cash on execution of the lease, or out of production at some later date.'" *Enerquest*, 981 F. Supp. 2d at 602. "Bonuses are also frequently computed at a cash amount per acre." *Enerquest*, 981 F. Supp. 2d at 602. "What in reality is a bonus retains its nature even though it takes the form of a delayed bonus . . . . [A] true bonus is a payment which the lessee is obligated to make in all events, with or without production, which cannot be avoided by termination or abandonment of the lease arrangement." *Enerquest*, 981 F. Supp. 2d at 603–04 (quoting 5 *Mertens Law of Fed. Income Tax'n* § 24:29).

11

The exercise of a "surrender" clause in an oil and gas lease terminates the existing legal relationship between lessor and lessee created by the lease, but it does not relieve the lessee from the duty to perform obligations already incurred at the time of surrender. *Aderhold v. Oil Well Supply Co.*, 28 A. 22, 23 (Pa. 1893) ("[L]iabilities once accrued confer a right of action on the lessor. He may release or surrender this right by his own act, but his debtor cannot surrender it for him, or extinguish it by any act of his. This is well settled."); *Douthett v. Gibson*, 11 Pa. Super. 543, 546–47 (1899) (surrender did not relieve lessee from obligation to pay rents accrued prior to the surrender).

There appears to be no dispute that the $4,000 per acre payment set forth in paragraph 22 of the lease addendum is "bonus" consideration, as that term is commonly used within the oil and gas industry. There also appears to be no dispute that SWEPI had an absolute right to surrender the lease and did so, extinguishing any future obligations under the leases.

The crux of the parties' dispute is whether, or when, SWEPI's obligation to pay the bonus consideration accrued. The Plaintiffs contend that the payment obligation accrued at the time of execution of the leases, before SWEPI exercised its contractual right to surrender the leases, and SWEPI contends that it never accrued, as the lease was surrendered prior to expiration of the ninety banking day period following presentment of the bonus drafts for collection.

In support of their position, SWEPI relies heavily on three cases involving somewhat similar facts: *Mickel Drilling Partners v. Cabot Oil & Gas Corp.*, No. 3:11-CV-0061, 2012 WL 4953081 (M.D. Pa. Oct. 16, 2012) (Caputo, J.); *Kuhn v. Chesapeake Energy Corp.*, No. 1:12-cv-086, 2012 WL 4442798 (D.N.D. Sept. 25, 2012); and *Kaufman v. Chesapeake Energy Corp.*, No. 1:12-CV-087, 2012 WL 4442799 (D.N.D. Sept. 25, 2012). However, the Court finds these cases

to be readily distinguishable from the matter presently before it.

In *Mickel*, the parties' agreement provided that "[s]ubject to Cabot Oil & Gas Corporation's approval of title, Cabot Oil & Gas will pay, within 60 days receipt of the subject Oil and Gas Lease, properly executed, the sum of $95,925.00 Dollars, which represents the bonus consideration." *Mickel*, 2012 WL 4953081, at *1. The operative lease agreement was executed on October 8, 2008, and lessee Cabot terminated the lease pursuant to a surrender clause on November 11, 2008, well within the sixty day period and thus before its obligation to make the bonus payment accrued. *Mickel*, 2012 WL 4953081, at *8 & n.6. Based on these facts, Judge Caputo found that Cabot was under no obligation to make the bonus payment and therefore the plaintiffs failed to state a claim for breach of contract. *Mickel*, 2012 WL 4953081, at *8.

In *Kuhn* and *Kaufman*, lessee Chesapeake Exploration "promised to pay the bonuses within sixty days or surrender the Leases." *Kuhn*, 2012 WL 4442798, at *3; *Kaufman*, 2012 WL 4442799, at *4. Specifically, Chesapeake promised that its landman would "tender payment to the Lessor ... by check within 60 days of its receipt of ... the executed Lease." Compl. Ex. B, *Kuhn v. Chesapeake Energy Corp.*, No. 1:12-cv-00086 (D.N.D. filed July 2, 2012) (Doc. 1-1, at 19); Compl. Ex. B, *Kaufman v. Chesapeake Energy Corp.*, No. 1:12-cv-00087 (D.N.D. filed July 2, 2012) (Doc. 1-1, at 17).[6] Chesapeake surrendered the leases within the sixty day period before

---

[6] Although the published opinions in *Kuhn* and *Kaufman* did not relate the specific terms of the underlying agreement with respect to Chesapeake's bonus payment obligations, this Court may take judicial notice of the contents of another court's docket. *See Orabi v. Att'y Gen. of the United States*, 738 F.3d 535, 537 n.1 (3d Cir. 2014). A court may look to matters of public record, including court files and records, without converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment. *See Colbert v. Mercy Behavioral Health*, 845 F. Supp. 2d 633, 637 (W.D. Pa. 2012); *see also Tellabs*, 551 U.S. at 322.

payment of the bonus was due. *Kuhn*, 2012 WL 4442798, at *4; *Kaufman*, 2012 WL 4442799, at *4. Based on these facts, the court found that Chesapeake was under no obligation to make the bonus payments and thus the plaintiffs failed to state a claim for breach of contract. *Kuhn*, 2012 WL 4442798, at *4; *Kaufman*, 2012 WL 4442799, at *4.

In *Mickel*, *Kuhn*, and *Kaufman*, each lease agreement provided definitively for a delayed bonus payment, due to be paid sixty days after execution of the lease by the lessor. At the time of surrender of each lease, payment of the bonus was not yet due and no payment whatsoever had been tendered. In sum, these three cases stand for the unexceptional proposition that surrender of an oil and gas lease extinguishes future obligations, including delayed bonuses that are not yet due to be paid. *See Aderhold*, 28 A. at 23; *Douthett*, 11 Pa. Super. at 546–47; *3 Summers Oil and Gas* § 25:4 (3d ed. 2013).

The distinction between those cases and this one lies in the terms of the bonus provision, set forth in paragraph 22 of the lease addendum. The leases in *Mickel*, *Kuhn*, and *Kaufman* each provided, *in clear and unambiguous terms*, for a delayed bonus payment, due sixty days after execution of the lease, and each lease was surrendered before payment of the bonus was tendered by the lessee. In this case, however, the bonus provision contains an apparent ambiguity, suggesting that SWEPI's bonus payment obligation may have accrued (and been tendered) prior to surrender of the leases, in which case SWEPI's bonus payment obligation was not extinguished by the surrender.

Paragraph 22 of the lease addendum, labeled "Payment," is comprised of four sentences:

In consideration for the attached paid-up Oil and Gas Lease, Lessee hereby agrees to pay Lessor: *FOUR THOUSAND* and 00/100 dollars ($*4000*.00) per net mineral acre. Payment shall be due within ninety (90) banking days of the Lessor presenting the Bank Draft to the financial institution of his/her/their choosing. All payment obligations are subject to title verification by Lessee. Said title verification shall be completed within the aforementioned ninety (90) banking

14

day period.

(Doc. 1-2, at 9; Doc. 1-3, at 9).

Based on the text of this provision, SWEPI contends that its obligation to pay the $4,000 per acre bonus was not due until ninety banking days after presentment of the drafts it tendered to the Plaintiffs in January 2012. SWEPI contends that the phrase "Payment shall be due within ninety (90) banking days" in the second sentence references payment of the bonus consideration set forth in the preceding sentence. On its face, this appears to be a reasonable construction of the bonus provision.[7] This construction is further supported by the third and fourth sentences, which suggest that the verification of the lessor's possession of good title may have been a condition precedent to SWEPI's bonus payment obligation. *See Bridge Funding, Inc. v. LNR Partners, LLC*, Civ. Action No. 12-cv-671, 2013 WL 943284, at *3 n.4 (E.D. Pa. Feb. 22, 2013) ("conditions precedent are generally indicated by the term[] ... 'subject to'"). Given the posture of the case, presently before the Court upon SWEPI's motion to dismiss, and in the absence of a motion for judgment on the pleadings or for summary judgment by the Plaintiffs, the Court will assume that this is indeed one reasonable construction of the words of the bonus

---

[7] Considering the facts alleged in the complaint, however, the extensive delay in payment of the bonus drafts tendered to the Plaintiffs by SWEPI is enough to give one pause. Prior to surrender of the leases, the collecting bank had taken the position that payment on the drafts was not due until June 6, 2012, more than seven months after the leases were originally executed. (*See* Doc. 1-14; Doc. 1-16). The bonuses in *Mickel*, *Kuhn*, and *Kaufman*, by contrast, were due to be paid within sixty days of lease execution. The Court further notes that the bonus in *Cardinale v. R.E. Gas Dev'p LLC*, 74 A.3d 136 (Pa. Super. Ct. 2013), another recent case relied upon by the parties but otherwise inapposite, similarly required payment by check within sixty days after lease execution. *See Cardinale*, 74 A.3d at 140.

provision.[8]

On the other hand, the Plaintiffs argue that second, third, and fourth sentences of paragraph 22 merely address the timing of actual payment of the bonus *drafts*, providing SWEPI a period of ninety banking days in which to verify good title, as distinct from SWEPI's bonus payment obligation under the lease, which the Plaintiffs argue accrued immediately upon execution. *See* Pls.' Br. 11 ("The 90 day period simply defines *when*, not *if*, the agreed upon payment is to be made.") (Doc. 10, at 18). The Plaintiffs further argue that SWEPI could only refuse to pay the bonus if it found defective title. *See* Pls.' Br. 11 ("That obligation, i.e., that promise to pay, is a 'certain inducement' conditioned *only* on the determination that the Lessors actually own the oil and gas.") (Doc. 10, at 18).[9] The question before the Court, then, is whether this alternative meaning suggested by the Plaintiffs is objectively reasonable. *See Mellon Bank*, 619 F.2d at 1011.

### C.  Use of the Term "Bank Draft" in Paragraph 22

As previously recited, "[c]ourts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Great Am. Ins.*, 544 F.3d at 243. Keeping this in mind, the words of the second sentence of paragraph 22 are particularly noteworthy: "Payment shall be due within ninety (90) banking days of the Lessor presenting *the Bank Draft* to the financial institution of his/her/their

---

[8] Even if unreasonable, it would be premature at this stage of the proceedings to resolve the ultimate issue of contract interpretation against SWEPI as a matter of law. *See supra* note 5 (citing *Butters Living Trust*, 2013 WL 3679533, at *4*).

[9] As these citations demonstrate, the legal theories upon which this and the previous report and recommendation rest are not simply plucked from thin air, but rather they are rooted in the Plaintiffs' sparse but sound articulation of an alternative reasonable interpretation of the bonus provision.

choosing." (Doc. 1-2, at 9; Doc. 1-3, at 9) (emphasis added). Although capitalized, the term "Bank Draft" is nowhere defined in the lease or lease addendum, nor is it referenced elsewhere.

The term "bank draft" is a legal term of art, which must be "interpreted in accord with [its] specialized or accepted usage." *Mellon Bank*, 619 F.2d at 1013. A "draft" is "[a]n unconditional written order signed by one person (the *drawer*) directing another person (the *drawee* or *payor*) to pay a certain sum of money on demand or at a definite time to a third person (the *payee*) or to bearer." *Black's Law Dictionary* 508 (7th ed. 1999). A "draft" is typically a negotiable instrument governed by Articles 3 and 4 of the Uniform Commercial Code, as adopted by the Commonwealth of Pennsylvania. *See* 13 Pa. Cons. Stat. §§ 3102, 4102 (addressing the scope of UCC Articles 3 and 4); 13 Pa. Cons. Stat. § 3104 (defining "negotiable instruments" under Article 3 to include drafts). *But see* 13 Pa. Cons. Stat. § 4104 (expanding the definition of "draft" under Article 4 to also include non-negotiable orders to pay money handled by a bank for collection or payment). *See generally* Albert J. Rosenthal, *Negotiability — Who Needs It?*, 71 Colum. L. Rev. 375, 394–96 (1971) (discussing the use of drafts and acknowledging the existence of non-negotiable drafts transmitted through banking channels for collection or payment). Meanwhile, a "bank draft" is a type of draft, "drawn by one financial institution on another." *Black's Law Dictionary* 508 (7th ed. 1999); *see also* 12 C.F.R. § 210.2(e) ("Bank draft means a check drawn by one bank on another bank."); *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 655 (Tex. 1990) (noting that "bank draft" is a banking industry term for a draft drawn by one bank on an account maintained in another bank or financial institution); *cf. Great Atlantic & Pacific Tea Co. v. Citizens' Nat'l Bank*, 66 F.2d 883, 884 (3d Cir. 1933) (noting that a bank draft is paid from the bank's own funds, the customer having "purchased the credit of the bank").

The Uniform Commercial Code does not utilize the specific term "bank draft," instead labeling this particular instrument a "teller's check." *See* 13 Pa. Cons. Stat. § 3104(h)(1) (defining "teller's check" as "a draft drawn by a bank … on another bank"); *see also* Henry J. Bailey, *New 1990 Uniform Commercial Code: Article 3, Negotiable Instruments, and Article 4, Bank Deposits and Collections*, 29 Willamette L. Rev. 409, 433 (1993) ("[A] 'bank draft' is equivalent to a 'teller's check.'"); Michael J. Shavel, Comment, *Cash Equivalents and the Stop Payment Order*, 16 Ohio N.U. L. Rev. 691, 692 n.6 (1989) ("This type of instrument [a 'teller's check'] may also be referred to as a 'bank draft.'"); Leona Beane, *Rights of Drawers, Banks, and Holders in Bank Checks and Other Cash Equivalents*, 19 Tulsa L.J. 612, 645 (1984) ("Another type of instrument drawn by a bank is referred to as a 'bank draft,' more commonly known as a 'teller's check' in the eastern states."). Significantly, under the Uniform Commercial Code, the tender of a teller's check operates the same as tender of cash, discharging any payment obligation to the same extent as payment of money equal to the amount of the teller's check.[10] *See* 13 Pa. Cons. Stat. § 3310(a), (c)(1).

Thus, taking into account the accepted usage of the term of art "bank draft," the second sentence of paragraph 22 may be reasonably interpreted as a requirement that payment of the specified bonus consideration be tendered in the form of a bank draft payable ninety banking days after presentment, during which time SWEPI would perform any necessary title

---

[10] This may be contrasted with the effect of tendering payment by an uncertified check or other form of instrument not drawn by a bank, which merely suspends the payment obligation subject to a condition subsequent that the instrument be honored. *See* 13 Pa. Cons. Stat. § 3310(b), (c)(2); *see also* *Romaine v. Workers' Compensation Appeal Bd.*, 901 A.2d 477, 482 (Pa. 2006) ("[P]ayment occurs upon receipt of a check, with the condition that it be honored.").

examination.[11] This interpretation has the virtue of being logically consistent, avoiding a

construction in which SWEPI's obligation to pay the bonus consideration did not arise until

several months *after* it had already been tendered in the form of a cash-equivalent negotiable

instrument, i.e., the bank draft. It is consistent with other payment terms of the leases.[12]

Further, it is consistent with the rule of *noscitur a sociis*, which provides that "different clauses of

the same sentence should be presumed to embrace the subject matter of the sentence." *See*

*Graham County Soil & Water Conservation Dist. v. United States*, 559 U.S. 280, 293 n.12 (2010)

(internal quotation marks omitted); *see also Northway Village No. 3, Inc. v. Northway Props., Inc.*,

244 A.2d 47, 50 (Pa. 1968) ("The ancient maxim 'noscitur a sociis' summarizes the rule that the

meaning of words may be indicated or controlled by those words with which they are

associated. Words are known by the company they keep.") (construing the terms of a lease).

    This interpretation is also consistent with any affirmative duty to exercise good faith and

fair dealing to which SWEPI *may* have been subject under the leases. *See Smith v. Arrington Oil &*

---

[11] In this context, placed adjacent to the term of art "bank draft," the word "presenting" is also a term of art, which connotes "delivery for the specific purpose of payment." *Scadif, S.A. v. First Union Nat'l*, 344 F.3d 1123, 1128 & n.5 (11th Cir. 2003); *see also* 13 Pa. Cons. Stat. § 3501(a) (defining "presentment" of an instrument under the Uniform Commercial Code); 13 Pa. Cons. Stat. § 4104(c) (adopting § 3501(a) definition of presentment for application under Article 4 of the Uniform Commercial Code).

[12] Notably, the preprinted lease terms provide that all payments to the lessor must be made by check. (Doc. 1-2, at 2; Doc. 1-3, at 2). Variance from this provision with respect to the payment of bonus consideration permitted the parties to ameliorate two risks that they otherwise would have faced if payment was made by check: (1) unlike an ordinary check, which is payable on demand, the use of a bank draft allowed SWEPI to defer settlement of each of the $2 million bonus drafts until after the lessors' title had been verified; and (2) unlike an ordinary check, a bank draft typically avoids, or at least mitigates, the risk to the payee of a stop payment order or a notice of insufficient funds. *See generally* Shavel, *Cash Equivalents, supra,* at 691–93, 700–04 (discussing the risk of dishonor with respect to teller's checks and other "cash equivalents" under the Uniform Commercial Code).

*Gas, Inc.*, 664 F.3d 1208, 1216–18 (8th Cir. 2012) (applying Arkansas law); *Zaloga v. Provident Life & Accident Ins. Co. of Am.*, 671 F. Supp. 2d 623, 629–30 (M.D. Pa. 2009) (predicting that the Supreme Court of Pennsylvania would recognize an implied covenant of good faith and fair dealing in all contracts); *Kamuck v. Shell Energy Holdings GP, LLC*, No. 4:11-CV-1425, 2012 WL 1463594, at *6 (M.D. Pa. Mar. 19, 2012) (magistrate judge's report) (relying on *Zaloga* in the context of oil and gas leases), *adopted in relevant part by* 2012 WL 1466490 (M.D. Pa. Apr. 27, 2012) (Conner, J.); *Cole v. Philadelphia Co.*, 26 A.2d 920, 922–23 (Pa. 1942) (holding that oil and gas lease provision permitting surrender at any time lessee deemed lease unprofitable did not permit arbitrary surrender); *see also Interwave Tech. Inc. v. Rockwell Automation, Inc.*, No. Civ. A. 05-398, 2005 WL 3605272, at *9–*12 (E.D. Pa. Dec. 30, 2005) (finding, in a non-UCC context, that an implied duty to act in good faith "applied to limit the possibility of self-dealing conduct such as 'where a contract grants one party discretion over some aspect of performance, for in these cases the party accorded discretionary power can opportunistically subvert the legitimate expectations of the other party'"). Finally, under this interpretation, SWEPI's obligation to tender payment of bonus consideration by bank draft would have arisen at the time of execution of the leases, or within a reasonable time thereafter, and therefore it would have accrued well before the lease was surrendered in May 2012, six months after execution. *See L.C.S. Colliery, Inc. v. Globe Coal Co.*, 84 A.2d 776, 782 (Pa. 1951) ("Where time of performance is not specified a reasonable time is implied."); *Wright v. Monongahela Natural Gas Co.*, 2 Pa. Super. 219, 223 (1896) (construing oil and gas lease).

   D.  SWEPI'S COUNTER-ARGUMENTS

   SWEPI, however, contends that this interpretation of the lease agreements is objectively unreasonable, advancing two primary arguments in support of this position. First, SWEPI

contends that the actual drafts tendered to the Plaintiffs, several weeks or months after the lease was executed, were not negotiable instruments subject to Article 3 of the Uniform Commercial Code,[13] and therefore the Uniform Commercial Code provisions referenced above cannot inform a reasonable interpretation of the previously executed lease agreement. Second, SWEPI contends that the lease agreement explicitly disclaims any implied duties, including any implied covenant of good faith and fair dealing that might ordinarily be imposed under Pennsylvania law. In addition, SWEPI contends that case law and secondary sources support its position that surrender of a lease extinguishes any bonus payment obligation not yet due to be paid when the lease is surrendered, but this last point simply rehashes SWEPI's original arguments and assumes away the actual point of dispute — whether SWEPI's bonus payment obligations accrued before or after it surrendered the leases in this case.[14]

With respect to the applicability of the Uniform Commercial Code, SWEPI first notes that, as the original report and recommendation in this case acknowledged, the language of Paragraph 22 may be read to suggest that verification of the lessors' possession of good title may have been a condition precedent to SWEPI's bonus payment obligation. The quoted passage indeed acknowledged this as *one* reasonable interpretation of the bonus provision, but

---

[13] It would appear to be beyond cavil that Article 4 of the Uniform Commercial Code, which governs the banking process utilized for collection of non-negotiable items as well as negotiable instruments, is applicable. SWEPI's protest is with the possible interpretation of the term "bank draft" in the bonus provision to mean a cash-equivalent negotiable instrument under Article 3 of the Code.

[14] In essence, SWEPI contends that it is entitled to the benefit of prior decisions involving the surrender of oil and gas leases with clearly worded terms providing for the deferred payment of bonus consideration, notwithstanding the distinctly different, and far less pellucid, bonus payment terms actually utilized in the Masciantonio and Latshaw leases. More simply put, SWEPI would like to substitute the clear and unambiguous lease terms favored by its competitors in place of the more inscrutable language chosen by its own draftsman.

the focus of the present inquiry is properly on whether an *alternative* reasonable interpretation exists.

SWEPI next refers to the bonus drafts it actually issued, arguing that reference to the Uniform Commercial Code in interpreting terms of the lease is improper because the drafts themselves are conditional and therefore non-negotiable. But, as noted at the outset of this report and its predecessor, the drafts were not tendered contemporaneously with the lease, nor even close in time, and therefore cannot properly be considered in construing the terms of the lease at this preliminary stage. *See Kropa v. Cabot Oil & Gas Corp.*, 609 F. Supp. 2d 372, 376–77 (M.D. Pa. 2009) (construing an oil and gas lease); *Int'l Milling Co. v. Hachmeister, Inc.*, 110 A.2d 186, 191 (Pa. 1955). Moreover, SWEPI fails to identify any express condition on the face of the bonus drafts actually tendered to the Plaintiffs.[15] SWEPI cites a "no liability" clause on the face of each of the drafts, but this particular "no liability" clause does not appear to express any condition whatsoever, but rather it appears merely to preclude an independent action on the draft itself. But the Plaintiffs here have sued for breach of the leases, not for wrongful dishonor of the drafts. Indeed, on their faces, each of the bonus drafts tendered to the Plaintiffs in this

---

[15] The drafts provide on their faces that "[t]he payor shall have <u>90</u> banking days after receipt of this draft by the collecting bank . . . for title examination and for payment." (Doc. 1-6; Doc. 1-8; Doc. 1-13; Doc. 1-15). Words such as "if," "upon," "provided that," or "subject to" typically signal an express condition. *See Bridge Funding*, 2013 WL 943284, at *3 n.4 ("on the condition," "subject to," "when," "as soon as," "if," "provided that"); *Benchmark Grp., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 562, 576 (E.D. Pa. 2009) ("upon"); *Triffin v. Dillabough*, 716 A.2d 605, 613 (Pa. 1998) ("if"); *Higbee Corp. v. Kennedy*, 428 A.2d 592, 596 (Pa. Super. Ct. 1981) ("provided," "if," "upon the condition that"); *see also Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1034 (W.D. Wash. 2012) ( "so that," "while," "after"). On their faces, the bonus drafts tendered by SWEPI in this case do not appear to express a condition, but merely appear to describe the purpose of the 90 banking day period before settlement of the drafts was due. At best, the drafts themselves evince only an *implicit* condition of good title.

case appears to be an unconditional order to pay a fixed amount of money, payable to the order of the Plaintiffs and payable at a definite time (90 banking days after presentment), and thus each appears to be a negotiable instrument. *See* 13 Pa. Cons. Stat. § 3104(a).

SWEPI further notes that the bonus drafts it tendered were neither drawn by nor on a bank. Instead, the actual drafts tendered to the Plaintiffs, some weeks or months after each lease was executed, were apparently drawn by a landman on SWEPI.[16] The only bank explicitly identified on the faces of the drafts is Amegy Bank N.A., which is designated as the "collecting bank." This distinction is important because, as previously noted, tender of a *bank draft* is effectively the same as a tender of cash, discharging any payment obligation upon tender, whereas tender of an uncertified check or other form of instrument not drawn by a bank merely suspends the payment obligation subject to a condition subsequent that the instrument be honored. *See* 13 Pa. Cons. Stat. § 3310; *Romaine*, 901 A.2d at 482. But, to reiterate, these drafts were not tendered contemporaneously with the lease, nor even close in time, and therefore they are extrinsic evidence that cannot properly be considered in construing the terms of the lease at this preliminary stage. *See Kropa*, 609 F. Supp. 2d at 376–77; *Int'l Milling*, 110 A.2d at 191. Moreover, even if the Plaintiffs' acceptance of these drafts, not drawn by or on a bank, and their presentation of them to their own bank for collection might constitute a waiver of any defective performance under the lease, they remain beyond the limited scope of inquiry at this, the dismissal stage.

---

[16] The identity or role of the drawer and drawee of the bonus drafts actually tendered are not clear from the face of the drafts, which contain only the drawer's illegible signature over a line labeled "Agent Signature" and which identify the drawee only as "Client #8497." Counsel for SWEPI, however, has identified the drawer of these drafts as SWEPI's landman/agent, and the drawee as SWEPI.

Finally, SWEPI argues that it is customary in the oil and gas industry for bonus consideration to be paid by heavily conditioned sight drafts, drawn by a landman on the lessee. In support, SWEPI cites two publications by oil and gas lawyers discussing this customary payment process.[17] Both describe the customary use of "sight drafts" to pay bonus consideration, typically including express conditions such as management approval or verification of good title, and typically providing for settlement of the draft some substantial period of time *after* sight or presentment. Notably, however, neither provides a contrary gas-and-oil industry usage for the term "bank draft."[18] Indeed, SWEPI's reliance on these materials seems to be based on its misapprehension that a "sight draft" is the same as a "bank draft."

A "sight draft" is "[a] draft that is payable on the bearer's demand or on proper presentment to the drawer." *Black's Law Dictionary* 508 (7th ed. 1999). This may be contrasted with a "time draft," which is "[a] draft that contains a specified payment date," such as the drafts actually tendered in this case (90 banking days after presentment). *Black's Law Dictionary* 508 (7th ed. 1999). *See generally* 13 Pa. Cons. Stat. § 3108. It is apparently not uncommon in the oil and gas industry for a "time draft" to be mistakenly referred to as a "sight draft." *See* Jesse R. Pierce, *The Use and Perils of Sight Drafts in Leasing Transactions*, 59 Rocky Mt. Min. L. Inst. 28-1, at § 28.01[2] (2013) (available on Westlaw).

---

[17] In their briefs, SWEPI has provided potentially ephemeral internet citations to the documents, but the Plaintiffs have attached copies of the two publications to their supplemental brief, preserving them for the record. (Doc. 28-2; Doc. 28-3).

[18] Indeed, even if SWEPI did provide evidence of a contrary industry-specific definition of "bank draft," there is nothing to demonstrate that the Plaintiffs — landowners with no apparent prior experience in the oil-and-gas industry — would have any reason to know of it, nor that the term as used in the leases was intended by both parties to embrace the oil-and-gas industry's peculiar usage of the term "bank draft" rather than the its general legal usage.

Regardless, as SWEPI notes, it is common in the oil and gas industry for bonus consideration to be tendered in the form of a draft, often subject to express conditions and to the elapse of a specified time period before payment is due. Pierce, *Sight Drafts, supra* at § 28.01[3]. But it is also not unheard of for bonus consideration to be paid using a negotiable instrument, such as a cashier's check drawn by a bank on itself. *See* Pierce, *Sight Drafts, supra* at § 28.03[2] ("[I]f the landowner wants the lease and the promise to pay the bonus to be immediately binding, the landowner should insist on a cashiers check or company check rather than a draft."). In any event, the industry custom described by SWEPI of paying bonus consideration by heavily conditioned time drafts is by no means exclusive of an express provision in a lease requiring an oil-and-gas lessee instead to pay by bank draft, mitigating any risk that the bonus draft might be dishonored.

As for the implied covenant of good faith and fair dealing, SWEPI notes that the lease expressly disclaimed any implied covenants or obligations, arguing that, as a consequence, reliance upon the implied covenant of good faith and fair dealing as an interpretive aid is therefore unreasonable. In support, SWEPI cites Pennsylvania cases finding that a contract may expressly disclaim any implied duty to mine or develop underground resources. *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986); *Caldwell v. Kriebel Res. Co., LLC*, 72 A.3d 611, 615 (Pa. Super. Ct. 2013). But the implied covenant of good faith and fair dealing is a horse of a different color. *See, e.g.*, Peter Linzer, *"Implied," "Inferred," and "Imposed": Default Rules and Adhesion Contracts — the Need for Radical Surgery*, 28 Pace L. Rev. 195, 198 n.10 (2008) (characterizing the implied covenant of good faith as an "immutable" rule that cannot be dispensed with at the option of the parties to a contract). As the Supreme Court of the United States has recently observed, the law of some states precludes a party from waiving the

25

obligations of good faith and fair dealing, transforming this "implied covenant" into a "state-imposed obligation." *See Northwest, Inc. v. Ginsberg*, 134 S. Ct. 1422, 1432 & n.2 (2014). Pennsylvania courts do not appear to have passed on the issue of whether, under the common law, the implied covenant of good faith and fair dealing may be waived or disclaimed by agreement, but they have equated the good faith requirements of the Uniform Commercial Code to those imposed by Pennsylvania common law. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 617 n.13 (3d Cir. 1995); *Interwave Tech.*, 2005 WL 3605272, at *9; *Somers v. Somers*, 613 A.2d 1211, 1242 (Pa. Super. Ct. 1992). Under the Uniform Commercial Code, the general obligation of good faith and fair dealing in the performance of a contract may not be disclaimed by agreement. 13 Pa. Cons. Stat. § 1302(b). Absent any legal authority to the contrary, it is reasonable to infer that a similar rule may apply under the common law. Under these circumstances, SWEPI has failed to establish that mere reference to the implied covenant of good faith and fair dealing to buttress an otherwise reasonable interpretation of a contractual provision has rendered that interpretation objectively unreasonable.

At this stage of the litigation, the question before the Court is whether the bonus provision of the lease agreements at issue is susceptible to more than one reasonable interpretation, and thus ambiguous. Thus, to prevail at this point, SWEPI must demonstrate that its interpretation is the *only* reasonable interpretation. It has failed to do so.

E. CONCLUSION

The parties have advanced alternative interpretations of the bonus provision contained in paragraph 22 of the lease addendum, and the Court finds that both alternatives are reasonable interpretations. Because the words of this provision are subject to more than one reasonable interpretation when applied to the facts of this case, the bonus provision is

ambiguous, opening the door to the consideration of extrinsic evidence in interpreting the parties' intent. Moreover, under the Plaintiffs' interpretation, SWEPI's obligation to pay the specified bonus consideration was not extinguished by surrender of the leases, and thus SWEPI may be liable for breach of contract. Accordingly, SWEPI has failed to meet its burden of showing that no claim has been stated.

## IV. RECOMMENDATION

Based on the foregoing, it is recommended that SWEPI's motion to dismiss (Doc. 6) be **DENIED**.

**BY THE COURT:**

**Dated: July 21, 2014**                    *s/ Karoline Mehalchick*
                                            **KAROLINE MEHALCHICK**
                                            **United States Magistrate Judge**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JANICE E. MASCIANTONIO, et al.,

                        Plaintiffs,

          v.

SWEPI LP,

                        Defendant.

CIVIL ACTION NO. 4:13-CV-00797

(CONNER, C.J.)
(MEHALCHICK, M.J.)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **July 21, 2014**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Dated: **July 21, 2014**

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**