**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JANET E. MASCIANTONIO,** *et al.*, | : | **CIVIL ACTION NO. 4:13-CV-797** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| **SWEPI LP,** | : | |
| | : | |
| **Defendant** | : | |

## <u>MEMORANDUM</u>

This breach of contract action presents a manifold dispute over the proper interpretation of a bonus payment provision in two separate but identical oil and gas leases executed by and between defendant SWEPI LP ("SWEPI") and two plaintiff groups of landowners: Janet E. Masciantonio and Martin J. Masciantonio, ("the Masciantonios"); and Paul R. Latshaw and Paul B. Latshaw, ("the Latshaws"), in their capacities as co-trustees of the Phyllis E. Latshaw Residuary Trust Created Under the Will of Phyllis E. Latshaw ("the Latshaw Trust"). Before the court are the parties' respective cross-motions (Docs. 57, 60) for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## I.   <u>Factual Background and Procedural History</u>[1]

The Masciantonios and the Latshaw Trust jointly own two parcels of land, including the subsurface oil, gas, and mineral rights thereto.  (Doc. 58 ¶ 9; <u>see</u> <u>also</u> Doc. 43 ¶ 7; Doc. 45 ¶ 7).[2]  The contiguous parcels are located in Jackson Township, Lycoming County, and have abbreviated tax parcel numbers of 18-148-102 and 18-149-115.  (Doc. 58 ¶ 9; <u>see</u> Doc. 61 ¶ 6).  The parties agree for purposes of the instant motions that the property has an assessed acreage of 1,036 acres, with tax parcel 18-148-102 encompassing 918 assessed acres and tax parcel 18-149-115 encompassing 118 acres.  (Doc. 61 ¶ 8; Doc. 65 ¶ 8; <u>see</u> <u>also</u> Doc. 58 ¶ 9).  In 2006, plaintiffs leased the property's oil and gas rights to East Resources, Inc.  (Doc. 61 ¶ 21; Doc. 65 ¶ 21).  Plaintiffs' lease with East Resources expired on September 30, 2011.  (Doc. 61 ¶ 27; Doc. 65 ¶ 27).  East Resources did not drill on the property during the primary term of its five-year lease.  (Doc. 61 ¶ 26; Doc. 65 ¶ 26).

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues for trial.  <u>See</u> <u>id.</u>  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (<u>See</u> Docs. 58, 61, 65, 69).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] SWEPI contests whether plaintiffs in fact own the subject property, (<u>see</u> Doc. 69 ¶ 9), but produces no contrary evidence in support of its denial as required by Local Rule 56.1.  <u>See</u> <u>supra</u> note 1 & discussion <u>infra</u> at 43-45.

SWEPI is a limited partnership wholly owned by various subsidiary entities constituting Royal Dutch Shell PLC ("Shell"). (See Doc. 58 ¶¶ 4-5; Doc. 69 ¶¶ 4-5). SWEPI acquired certain of East Resources' assets in 2010, but it is unclear from the parties' submissions whether plaintiffs' prior lease was among the assets acquired. (See Doc. 58 ¶ 18; Doc. 69 ¶ 18). After the East Resources lease expired, plaintiffs entertained competing offers to lease their oil and gas rights: one from Anadarko E & P Company, LP ("Anadarko"), and one from SWEPI. (See Doc. 58 ¶¶ 15-47; Doc. 61 ¶¶ 37-52; Doc. 65 ¶¶ 37-52; Doc. 69 ¶¶ 15-47). Plaintiff Martin J. Masciantonio ("Masciantonio") acted on behalf of, and as the principal contact for, all plaintiffs during these discussions. (Doc. 58 ¶ 3; Doc. 61 ¶ 45; Doc. 65 ¶ 45; Doc. 69 ¶ 3).

Negotiations began in approximately October 2011, when Anadarko offered to lease plaintiffs' oil and gas rights for $4,000 per net mineral acre and an eighteen percent (18%) royalty. (Doc. 58 ¶ 15; Doc. 69 ¶ 15). Masciantonio knew that SWEPI had acquired the assets of plaintiffs' former lessee, and he contacted SWEPI to determine whether it was interested in leasing plaintiffs' property. (Doc. 58 ¶ 19; Doc. 69 ¶ 19). Masciantonio contacted SWEPI because he believed plaintiffs' prior relationship with East Resources would result in "an easier time" with the leasing process. (Doc. 61 ¶ 42; Doc. 65 ¶ 42). Thenceforth, Masciantonio communicated exclusively with Fred Piombino ("Piombino"), a landman with Long Consulting Group, LLC, who represented SWEPI in the parties' lease negotiations. (See Doc. 58 ¶¶ 7, 20; Doc. 61 ¶¶ 43-44; Doc. 65 ¶¶ 43-44; Doc. 69 ¶¶ 7, 20).

Piombino advised Masciantonio during an inceptive telephone conversation that SWEPI would agree to a lease with a five-year primary term, a $2,000 per acre

bonus payment, and a fifteen percent (15%) royalty.  (See Doc. 61 ¶ 47; Doc. 65 ¶ 47).

However, Piombino offered that the bonus payment would be remitted through an

"alternative method," i.e. a payment method other than cashier's check or certified

check.  (See Doc. 61 ¶ 47; Doc. 65 ¶ 47).  Over the next few weeks, Piombino and

Masciantonio also discussed the terms of an addendum which would supersede

the terms of SWEPI's standard form lease.  (Doc. 58 ¶ 21; Doc. 69 ¶ 21).  Piombino

provided Masciantonio with a form lease to review, in addition to a draft addendum

and draft memorandum of lease.  (See Doc. 58 ¶¶ 22-24; see also Doc. 69 ¶¶ 22-24).

Masciantonio then suggested that Piombino travel to his family's home for

additional negotiations.[3]  (See Doc. 61 ¶ 49; Doc. 65 ¶ 49).

---

[3] SWEPI seeks a spoliation inference against plaintiffs as a result of
Masciantonio's failure to preserve certain email communications with Piombino
concerning the parties' negotiations.  (See Doc. 62 at 32-33).  Masciantonio testified
that he communicated with Piombino and Anadarko representatives via email, but
his computer "crashed" approximately six months before his deposition, taking
with it any preserved email correspondence.  (Doc. 61-2, Masciantonio Dep. 168:12
-170:24 (June 3, 2015)).  SWEPI describes Masciantonio's failure to preserve this
electronic evidence as "negligent destruction" thereof.  (Doc. 62 at 33).  The record
does not support SWEPI's characterization of Masciantonio's actions, which appear
to have been purely accidental.  (See Doc. 61-2, Masciantonio Dep. 168:12-170:24,
172:3-176:16).  Courts presented with spoliation requests regularly decline to apply
the inference when "the party's conduct was no worse than negligent, or where the
evidence was lost in the normal course of daily business or other similar activity."
Bozic v. City of Washington, 912 F. Supp. 2d 257, 270 (W.D. Pa. 2012) (collecting
cases).  In any event, the only prejudice SWEPI cites is an inability to discern "the
date or method of transmission" of certain documents to Masciantonio, information
which has no evident bearing on the issues in dispute.  (See Doc. 69 ¶¶ 22-24).
Hence, the court will not apply a spoliation inference.

On November 5, 2011, Piombino met in person with the Masciantonios and

Paul R. Latshaw ("Latshaw") and presented two proposed paid-up oil and gas

leases, addenda, and memoranda of lease.  (Doc. 58 ¶ 26; Doc. 69 ¶ 26).  SWEPI's

preprinted leases and memoranda listed the property's acreage at 1,036 acres.

(Doc. 58 ¶ 27; Doc. 69 ¶ 27).  During the meeting, Masciantonio provided an

unrecorded survey to Piombino indicating that the property contains 1,144 acres.

(Doc. 58 ¶ 28; Doc. 69 ¶ 28).  Piombino crossed out the assessed acreage in the lease

documents and handwrote 1,144 acres into the documents where applicable.  (See

Doc. 58 ¶ 43; Doc. 69 ¶ 43).  Masciantonio also showed Piombino a written offer from

Anadarko to lease the property for $4,000 per acre.  (Doc. 58 ¶¶ 35-36; Doc. 69 ¶¶ 35

-36).  Ensuing negotiations resulted in SWEPI's agreement to lease the property at

$4,000 per acre for the surveyed 1,144 acres, and a fifteen percent (15%) royalty.

(See Doc. 61 ¶ 52; Doc. 65 ¶ 52).  Plaintiffs were made aware prior to execution of the

leases that the $4,000 per acre bonus payment would be made by "bank draft."  (See

Doc. 61 ¶ 53; Doc. 65 ¶ 53).

The Masciantonios executed their lease, the addendum thereto, and a

memorandum of lease during the November 5, 2011 meeting.  (Doc. 58 ¶¶ 11-12;

Doc. 61 ¶¶ 75-77; Doc. 65 ¶¶ 75-77; Doc. 69 ¶¶ 11-12).  Latshaw executed the Trust's

lease, addendum, and memorandum of lease at the same time.  (Doc. 58 ¶¶ 11-12;

Doc. 61 ¶¶ 78, 81-82; Doc. 65 ¶¶ 78, 81-82; Doc. 69 ¶¶ 11-12).  Co-trustee Paul B.

Latshaw signed the lease, addendum, and memorandum on or about November 10,

2011.  (Doc. 58 ¶ 13; Doc. 69 ¶ 13; see also Doc. 61 ¶ 80; Doc. 65 ¶ 80).  Thereafter,

Masciantonio promptly informed Anadarko that plaintiffs had leased the property to SWEPI, ceasing competitive negotiations.  (See Doc. 58 ¶ 47; Doc. 69 ¶ 47).

SWEPI's attorney-in-fact, F.E. Stacy ("Stacy"), signed the memoranda of lease on SWEPI's behalf.  (Doc. 58 ¶¶ 66, 84; Doc. 69 ¶¶ 66, 84).  SWEPI recorded the Masciantonio memorandum in Lycoming County on or about November 16, 2011, and recorded the Latshaw Trust memorandum on or about January 10, 2012.  (Doc. 58 ¶¶ 65, 83; Doc. 69 ¶¶ 65, 83).  The recorded memoranda of lease announce to the public, including competitors, "the existence of an Oil and Gas Lease" between the parties.  (See Doc. 56-17 at 1; Doc. 56-18 at 1; Doc. 61 ¶ 136).  Each memorandum states that the primary term of the lease is for a period of five years and that said term commenced on November 5, 2011.  (See Doc. 56-17 at 1; Doc. 56-18 at 1).

Plaintiffs' leases are substantively identical.  (See Docs. 56-15, 56-16).  The first paragraph of each lease contains a "granting clause," which provides:

> (1) LEASE – In consideration of the bonus consideration paid, the receipt of which is hereby acknowledged, and in further consideration of the covenants and agreements herein contained, Lessor does hereby grant, demise, lease and let exclusively to Lessee, its successors and assigns, the lands hereafter described for the purpose of exploring for, developing, producing and marketing oil, gas or other related substances produced in association therewith by all methods now known or hereafter known or hereafter discovered, in and under the following described land . . .

(Doc. 56-15 at 1; Doc. 56-16 at 1).  The leases set forth a primary term of five years. (See Doc. 56-15 at 1; Doc. 56-16 at 1).  Each lease contains a "surrender clause," authorizing SWEPI to surrender the lease at any time "by recording an appropriate

instrument of surrender in the proper county," whereupon the lease and any rights, rentals, and obligations thereunder shall terminate. (Doc. 56-15 at 2; Doc. 56-16 at 2). The leases state that no default may be declared against SWEPI for failure to make payment or otherwise perform unless SWEPI "shall refuse or neglect to pay or perform the same for sixty (60) days after having received written notice from" plaintiffs. (Doc. 56-15 at 3; Doc. 56-16 at 3). At plaintiffs' request, Piombino added a handwritten paragraph 19 to each lease, expressly incorporating the attached addenda. (See Doc. 58 ¶ 44; Doc. 69 ¶ 44; see also Doc. 56-15 at 3; Doc. 56-16 at 3).

The opening paragraph of each addendum declares that the terms thereof supersede any inconsistent or conflicting terms in the leases. (See Doc. 56-15 at 6; Doc. 56-16 at 6). Paragraph 22 of the addenda discusses SWEPI's bonus payment obligation as contemplated by the granting paragraph:

> 22. Payment: In consideration for the attached paid-up Oil and Gas Lease, Lessee hereby agrees to pay Lessor: _four thousand_ and 00/100 dollars ($ _4,000_ .00) per net mineral acre. Payment shall be due within ninety (90) banking days of the Lessor presenting the Bank Draft to the financial institution of his/her/their choosing. All payment obligations are subject to title verification by Lessee. Said title verification shall be completed within the aforementioned ninety (90) banking day period[.]

(Doc. 56-15 at 8; Doc. 56-16 at 8). The italicized portions of the above-quoted language represent Piombino's handwritten additions to the addenda. The notice provision of each addendum differs slightly from its corresponding lease, providing that, in the event SWEPI does not cure an alleged breach of the lease within sixty days of notice thereof, "Lessor may, at its sole option, terminate this Lease as to all of the lease premises." (Doc. 56-15 at 7; Doc. 56-16 at 7).

Plaintiffs did not receive their bonus drafts during the November 5 meeting. (See Doc. 58 ¶ 67; Doc. 69 ¶ 67).  Piombino mailed the Masciantonios' draft in the amount of $2,288,000 on November 17, 2011.  (Doc. 58 ¶ 68; Doc. 61 ¶ 92; Doc. 65 ¶ 92; Doc. 69 ¶ 68).  Masciantonio presented the draft to his bank on November 22, 2011. (Doc. 58 ¶ 70; Doc. 69 ¶ 70; see also Doc. 61 ¶ 98; Doc. 65 ¶ 98).  SWEPI issued the Latshaws' draft in the amount of $2,288,000 on December 12, 2011, (Doc. 61 ¶ 101; Doc. 65 ¶ 101), but Piombino did not mail the draft until December 29, 2011.  (See Doc. 58 ¶¶ 74-76; Doc. 69 ¶¶ 74-76).  Latshaw presented the draft to his bank on January 4, 2012.  (Doc. 58 ¶ 78; Doc. 69 ¶ 78; see also Doc. 61 ¶ 105; Doc. 65 ¶ 105).

SWEPI thereafter learned that the acreage set forth on plaintiffs' verifiable title is 1,036 acres rather than the 1,144 acres assessed in the unrecorded survey submitted by Masciantonio.  (See Doc. 61 ¶ 108; Doc. 65 ¶ 108; see also Doc. 58 ¶ 85; Doc. 69 ¶ 85).  The parties agreed to reduce the leased acreage to 1,036 acres, but currently dispute whether Piombino or plaintiffs suggested the revision.  (See Doc. 58 ¶¶ 85-87; Doc. 61 ¶ 108; Doc. 65 ¶ 108; Doc. 69 ¶¶ 85-87).  On January 23, 2012, Piombino met with plaintiffs at the Masciantonios' home to execute amendments reflecting the new acreage amount.  (See Doc. 58 ¶¶ 86-88; Doc. 69 ¶¶ 86-88).  The amendments establish the revised acreage and otherwise ratify the leases and memoranda "in every respect."  (Docs. 56-42, 56-43).  Stacy signed each amendment on SWEPI's behalf, and SWEPI recorded same on April 3, 2012.  (Doc. 58 ¶ 93; Doc. 69 ¶ 93).  SWEPI returned the first drafts unpaid in light of the amendment.  (See Doc. 61 ¶ 111; Doc. 65 ¶ 111).

Piombino presented the Masciantonios and Latshaws with new drafts in the amount of $2,072,000 each during his January 23 visit.  (Doc. 58 ¶ 89; Doc. 69 ¶ 89; see also Doc. 61 ¶ 112; Doc. 65 ¶ 112).  At plaintiffs' request, Piombino backdated the new drafts to November 5, 2011.  (See Doc. 58 ¶ 90; Doc. 61 ¶ 114; Doc. 65 ¶ 114; Doc. 69 ¶ 90).  Plaintiffs presented the drafts to their bank, which forwarded them to SWEPI's bank for collection.  (See Doc. 58 ¶ 92; Doc. 69 ¶ 92).  On January 30, 2012, SWEPI's bank issued separate domestic collection letters to the Masciantonios and Latshaws, indicating that the drafts were due for payment no sooner than June 6, 2012.  (See Doc. 61 ¶¶ 122-23; Doc. 65 ¶¶ 122-23).  Both the initial and replacement drafts contained the following language:

> The payor shall have 90 banking days after receipt of this draft by the collecting bank, whether accompanied by other papers or not, for title examination and for payment. Neither forwarding bank nor payee(s) nor the grantor(s) of such lease or conveyance may demand return of this draft or any accompanying papers prior to expiration of the time fixed.  Upon payment hereof collecting bank shall deliver this draft and any accompanying papers to payor and remit payment to forwarding bank.  No liability for payment or otherwise shall be attached to any of the parties hereto.

(Docs. 56-38, 56-40, 56-44, 56-45).

In April of 2012, SWEPI representatives began internally discussing the possibility of rejecting plaintiffs' leases and voiding the bank drafts.  (See Doc. 58 ¶ 95; Doc. 69 ¶ 95).  SWEPI's Rule 30(b)(6) designee, Lee Stockwell ("Stockwell"), was charged with determining whether to surrender plaintiffs' leases.  (Doc. 58 ¶ 95; Doc. 69 ¶ 95).  Brad Hallam ("Hallam"), a landman for Shell and one of Stockwell's principal advisors, emailed Stockwell on April 12, 2012, and raised the possibility

of "not accept[ing] the leases and void[ing] the drafts." (Doc. 58 ¶¶ 95-96; Doc. 69 ¶¶ 95-96). Hallam advised Stockwell, Stacy, and others that plaintiffs' leases were "acquired during the Texas Creek push at the end of 2011, and at the time [we] did not have knowledge of the competitor acreage surrounding it." (Doc. 58 ¶ 98; Doc. 69 ¶ 98). Hallam cited competitor acreage to the south and a "geohazard running through the northern portion" of plaintiffs' property in recommending SWEPI surrender the leases. (Doc. 58 ¶¶ 98-102; Doc. 69 ¶¶ 98-102). Stockwell agreed and authorized Hallam to "drop[] the acreage." (Doc. 58 ¶ 103; Doc. 69 ¶ 103). Stockwell testified that he was unaware of any defect in plaintiffs' title and that the state of plaintiffs' title was not a factor in his surrender determination. (See Doc. 58 ¶¶ 104, 109; Doc. 56-8, Stockwell Dep. 24:8-25:6, 28:7-30:12, 65:23-66:7 (June 5, 2015)).

On April 16, 2012, Kathryn E. Rogers, another attorney-in-fact for SWEPI, executed surrenders of both the Masciantonio and Latshaw leases. (Doc. 58 ¶ 114; Doc. 69 ¶ 114; see also Doc. 61 ¶ 125; Doc. 65 ¶ 125). SWEPI recorded the surrender documents on May 4, 2012, and provided plaintiffs with copies of the documents by letter dated May 7, 2012. (See Doc. 58 ¶¶ 115-16; Doc. 61 ¶¶ 126-27; Doc. 65 ¶¶ 126-27; Doc. 69 ¶¶ 115-16). Plaintiffs also received amended domestic collection letters for the drafts indicating that the leases were surrendered by SWEPI's land department. (Doc. 58 ¶ 117; Doc. 69 ¶ 117). Masciantonio wrote a demand letter to SWEPI dated May 17, 2012, expressing confusion as to why the Masciantonios' draft was canceled and urging SWEPI to cure the perceived breach within sixty days. (Doc. 56-46; see Doc. 58 ¶ 118; Doc. 69 ¶ 118). SWEPI did not respond to the demand letter. (Doc. 58 ¶ 118; Doc. 69 ¶ 118).

Plaintiffs commenced this action with the filing of a complaint (Doc. 1) for breach of contract on March 27, 2013, requesting identical awards of compensatory damages in the amount of $2,072,000.  SWEPI moved (Doc. 6) to dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  SWEPI argued that its obligation to pay the bonus drafts had not yet accrued at the time it surrendered the leases.  (See Doc. 7 at 7-11; Doc. 13 at 6-13).  Plaintiffs countered, in part, that the obligation to pay bonus consideration accrued immediately upon execution of the leases such that SWEPI's surrender did not extinguish its payment obligation. (See Doc. 10 at 17-18).

Following oral argument and supplemental briefing, Magistrate Judge Mehalchick issued a report (Doc. 20) recommending the court deny SWEPI's motion.  Judge Mehalchick opined that both parties had presented reasonable interpretations of the addenda's payment provision, rendering the agreements ambiguous.  (See id. at 10-19).  SWEPI objected to the report's reliance on legal theories not raised by the parties, (see Docs. 22-23), and the court remanded the motion to Judge Mehalchick for supplemental briefing limited to the issues raised by the report *sua sponte*.  (See Doc. 24).

Judge Mehalchick issued a second report (Doc. 31) on July 21, 2014, again opining that the payment provision of the lease addenda is susceptible to multiple reasonable interpretations: under the first, SWEPI's bonus payment obligation was not yet due at the time it surrendered the leases; under the second, SWEPI's bonus payment obligation accrued upon execution of the leases, or at a reasonable time thereafter, such that SWEPI was bound to pay the bonuses at the time of surrender.

(See id. at 14-20).  In reaching the latter interpretation, Judge Mehalchick likened the term "bank draft" as used in the addenda to a "teller's check" in the context of the Uniform Commercial Code ("UCC"), concluding that tender of the bonus drafts operates the same as tender of cash.  (Id. at 17-20).  SWEPI objected for a second time and reasserted many of the same challenges, including that a conditional draft is not a "negotiable instrument" subject to the UCC.  (Doc. 33).  SWEPI also argued that oil and gas industry custom and usage support its interpretation of the lease, and its interpretation alone.  (See id. at 8-12).

The undersigned denied SWEPI's motion by order (Doc. 34) dated September 9, 2014.  In adopting Judge Mehalchick's recommended disposition, the court did not directly endorse either of the interpretations identified by the report.  (See id. at 3 n.2).  Rather, the court observed that SWEPI's interpretation relied heavily on broad statements of industry custom which had yet to be substantiated, such that resolution of purported ambiguities in the lease agreements must await summary judgment.  (See id.)  On November 17, 2014, with SWEPI's consent (Doc. 41-21), plaintiffs filed an amended complaint (Doc. 43), adding a claim for fraudulent inducement.

Following a period of discovery, the parties timely filed the instant cross-

motions (Docs. 57, 60) for summary judgment, together with supporting papers.

(Docs. 56-72).  The motions are fully briefed and ripe for disposition.[4]

## II.   Legal Standard

Through summary adjudication, the court may dispose of those claims that

do not present a "genuine dispute as to any material fact" and for which a jury trial

would be an empty and unnecessary formality.  FED. R. CIV. P. 56(a).  The burden of

proof tasks the non-moving party to come forth with "affirmative evidence, beyond

the allegations of the pleadings," in support of its right to relief.  Pappas v. City of

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett,

477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to

---

[4] The court notes the pendency of a class action asserting similar breach of contract claims against SWEPI in the United States District Court for the Western District of Pennsylvania.  On September 14, 2015, Chief Judge Joy Conti Flowers certified a class of plaintiffs comprising persons who, on or after March 14, 2009, executed an oil and gas lease with SWEPI and in exchange received a bonus draft which "was neither paid nor replaced by a subsequently issued draft."  Walney v. SWEPI LP, No. 1:13-CV-102, 2015 WL 5333541, at *28-29 (W.D. Pa. Sept. 14, 2015). The Walney addenda do not appear to contain a provision dictating the procedure for bonus payments.  See id. at *1-7.  That payment provision is central to the instant dispute and materially distinguishes this case from Walney.  Moreover, the Walney class definition presently includes only form leases "labeled 'PA Paid Up Lease Rev. 06.09.2011.' "  Id. at *28.  The Masciantonio and Latshaw leases are labeled "PA Paid Up Lease Rev. 05.01.2011."  (Doc. 56-15 at 1; Doc. 56-16 at 1).  In an exercise of caution, the court convened a conference call with counsel to ascertain the impact of Walney, if any, on this action.  (See Doc. 78).  Counsel confirmed the matters to be distinct.  In the interim, plaintiffs in Walney moved to amend the class definition to include both the 06.09.2011 lease version and the 05.01.2011 version signed by the Masciantonios and Latshaws.  See Walney, No. 1:13-CV-102, Doc. 117. That motion is pending, and a hearing thereon is scheduled for August 11, 2016. See id. at Doc. 121.  Nonetheless, plaintiffs' counsel advised the court during the conference call that her clients intend to opt out of the Walney class should that court expand the class definition to include plaintiffs' claims.

sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed.  See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently.  See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Federal Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2014).  When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion.  FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

### III.   **Discussion**

The parties' diametric Rule 56 arguments center on the issue of SWEPI's obligation, if any, to pay bonus consideration.  SWEPI raises myriad defenses to contract formation and enforceability.  SWEPI also suggests that, per industry custom, any obligation to fund the bonus drafts was deferred for ninety days pending title verification, during which time SWEPI could surrender the leases without liability; in essence, SWEPI contends that the leases were wholly voidable

during the ninety-day period for title verification.[5]  Plaintiffs maintain that the leases and attendant bonus payment obligations were valid and enforceable upon execution and that SWEPI was contractually bound to pay the bonuses when it surrendered the leases.

Pennsylvania substantive law governs this diversity action.  See Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  Under Pennsylvania law, an oil and gas lease is considered to be of the same nature as a contract.  See T.W. Phillips Gas & Oil Co. v. Jedlicka, 42 A.3d 261, 267 (Pa. 2012) (citing Willison v. Consol. Coal Co., 637 A.2d 979, 982 (Pa. 1994)); Hutchinson v. Sunbeam Coal Corp., 519 A.2d 385, 389-90 (Pa. 1986).  Hence, the instant dispute is controlled by the same principles which govern Pennsylvania contract law.  See Jedlicka, 42 A.3d at 267 (citing Willison, 637 A.2d at 982).

### A.    Contract Formation

SWEPI asserts an incipient challenge to the proper formation and enforceability of the leases.  SWEPI's argument is twofold: *first*, that payment of the bonus drafts is the sole consideration for the leases, without remittance of which the leases must fail for want of consideration; and *second*, that the leases are subject to a condition precedent to formation and are ineffective unless and until SWEPI

---

[5] In resolving SWEPI's motion to dismiss, (see Doc. 31 at 12), the court observed that exercise of a surrender clause terminates the existing contractual relationship between lessor and lessee but does not relieve the lessee from its duty to perform obligations already incurred.  See Aderhold v. Oil Well Supply Co., 28 A. 22, 23 (Pa. 1893); 4-6 PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, OIL AND GAS LAW § 680.4 (2015); 3 NANCY SAINT-PAUL, SUMMERS OIL AND GAS § 25.4 (3d ed. 2015).  Plaintiffs agree with this established principle.  (Doc. 59 at 33-34).

verifies title to the subject property.  (Doc. 62 at 9-11).  Plaintiffs counter that the leases became effective and bound all parties upon execution, as evidenced by SWEPI's own exercise of the right to surrender thereunder.  (See Doc. 59 at 8-15). The court will address SWEPI's contract formation arguments *seriatim*.

### 1.  *Consideration*

The party relying on a contract's existence bears the burden of proving proper formation.  See Legendary Art, LLC v. Godard, 888 F. Supp. 2d 577, 584 (E.D. Pa. 2012) (quoting Edmondson v. Zetusky, 674 A.2d 760, 764 (Pa. Commw. Ct. 1996)).  Under Pennsylvania law, a contract is formed when parties thereto "reach a mutual understanding, . . .exchange consideration, and . . . delineate the terms of their bargain with sufficient clarity."  Weavertown Transp. Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003).  Consideration is a fundamental element of an enforceable contract.  Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Pa., 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (quoting Stelmack v. Glen Alden Coal Co., 14 A.2d 127, 128 (Pa. 1940)); see also Moran, 834 A.2d at 1172.  Whether a contract is supported by adequate consideration is a question of law for the court.  See Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, L.L.C., 929 F. Supp. 2d 460, 470 (W.D. Pa. 2013) (quoting Pennsy Supply, 895 A.2d at 601).

Consideration exists when a contract contemplates an exchange of acts, forbearances, or promises which are of "benefit to the promisor or . . . detriment to the promisee."  Pennsy Supply, 895 A.2d at 600 (quoting Moran, 834 A.2d at 1172). Consideration must be squarely bargained for by the parties to the agreement.  Id. (quoting Stelmack, 14 A.2d at 129).  The detriment incurred represents "the '*quid*

*pro quo*', or the 'price' of the promise, and the inducement for which it was made." Crown Coal & Coke Co., 929 F. Supp. 2d at 469 (quoting Stelmack, 14 A.2d at 128 -29).

SWEPI identifies the bonus consideration acknowledged by the leases' granting paragraph as the exclusive consideration supporting the parties' agreed exchange.  As noted *supra*, the granting paragraph provides, in pertinent part, that the agreement is made "[i]n consideration of the bonus consideration paid, the receipt of which is hereby acknowledged."  (Doc. 56-15 at 1; Doc. 56-16 at 1).  SWEPI suggests that its unilateral failure to pay or tender the bonus consideration renders the leases null *ab initio* for "absence of . . . consideration."  (Doc. 62 at 9-10).

SWEPI's defense conflates the consideration element of the parties' transaction with its post-formation performance obligation.  Subject only to title verification, SWEPI promised to pay bonus consideration in exchange for its right to possess, explore, and develop plaintiffs' subsurface oil and gas estate.  (See Doc. 56-15 at 1, 8; Doc. 56-16 at 1, 8).  Hence, SWEPI's consideration is its promise to perform—*not* performance itself.  (See Doc. 56-15 at 1, 8; Doc. 56-16 at 1, 8).  This formulation, consisting of a promise inducing a detriment and a detriment inducing a promise, represents valid consideration under Pennsylvania law.  See Pennsy Supply, 895 A.2d at 600-01.

SWEPI posits in a related argument that the granting paragraph requires an immediate exchange of consideration, rather than an exchange of a promise for performance, failure of which invalidates the leases from the outset.  (See Doc. 62 at 9-10).  Stated differently, SWEPI perceives that "it is the actual payment of the

amount per acre that is the consideration, not the promise to pay it," such that SWEPI's election not to pay the bonuses at execution precludes formation of a binding contract.  (Id. at 8).  SWEPI maintains that to construe the granting paragraph to constitute a promise to pay at a later time would effectively rewrite the leases.  (See id.)

SWEPI's construction would require the court to examine the granting paragraph in isolation, separate from subsequent provisions governing manner of and timing for payment.  Paragraph 22 of the addenda, which "supersede[s]" any conflicting terms in the leases, explains that payment of the bonus consideration will be delayed: that SWEPI "agrees to pay" a sum of $4,000 per net mineral acre to plaintiffs and said bonus is payable "within ninety (90) banking days of the Lessor presenting the Bank Draft to the financial institution" of their choosing. (Doc. 56-15 at 6, 8; Doc. 56-16 at 6, 8).  The parties agree that payment is subject to at least one condition—title verification—rendering payment on execution a practical impossibility.  (See Doc. 56-15 at 8; Doc. 56-16 at 8; see also Doc. 58 ¶ 62; Doc. 69 ¶ 62).  To construe the granting paragraph as requiring contemporaneous payment to actuate the transaction would render that paragraph entirely inconsistent with the balance of the leases.  Such a construction flouts the maxim that all provisions of a contract must be read together and "given effect."  Camp Ne'er Too Late, LP v. SWEPI, LP, No. 4:14-CV-1715, 2016 WL 2594186, at *18, __ F. Supp. 3d __ (M.D. Pa. 2016) (quoting Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 469 (Pa. 2006)).

It is the exchange of a bargained-for promise, not the immediate exchange of the value envisioned thereby, which constitutes SWEPI's consideration for the leases *sub judice*.  The court declines SWEPI's invitation to invalidate the agreements solely by reason of its own declination to exchange the promised consideration.  The parties' oil and gas leases are sufficiently supported by valid and adequate consideration under Pennsylvania law.[6]

### 2.    *Condition Precedent to Formation*

SWEPI also implies that the title verification condition included within the addenda operates as a condition precedent to formation of the contracts, such that the leases are ineffective and nonbinding unless and until SWEPI verifies plaintiffs' title.  (See Doc. 62 at 10-11).  The Superior Court of Pennsylvania flatly rejected this argument in Cardinale v. R.E. Gas Development LLC, 74 A.3d 136 (Pa. Super. Ct. 2013).

The Cardinale lease documents included a provision conditioning the lessee's payment obligation on "its inspection, approval of the surface, geology and title" of plaintiffs' property.  Id. at 139.  The conditions were set forth in an order of payment, id., an instrument often employed in lieu of bank drafts in Pennsylvania.  (See Doc. 72-1 ¶¶ 16-17).  Like SWEPI, the lessee argued that the inspection

---

[6] In light of the court's finding that the promised bonuses represent adequate consideration, the court will not determine as a matter of law whether alternate consideration supports the leases.  Nonetheless, the court notes that each lease also requires SWEPI to pay monthly royalties to plaintiffs from any profitable oil and gas production during the primary term.  (See Doc. 56-15 at 1; Doc. 56-16 at 1).  At least one court has opined that royalty payments may constitute sufficient consideration to support an oil and gas lease.  See Irish Oil & Gas, Inc. v. Riemer, 794 N.W.2d 715, 721-22 (N.D. 2011).

and approval language established a condition precedent to formation of a valid contract.  See Cardinale, 74 A.3d at 141.  The Superior Court acknowledged that conditions precedent "can relate directly to the existence of an actual agreement," but concluded that such conditions more often limit only the duty of performance. Id. (citing Vill. Beer & Bev., Inc. v. Vernon D. Cox & Co., Inc., 475 A.2d 117, 122 (Pa. Super. Ct. 1984)).  The court found that the title inspection and approval language conditioned performance under the lease, *not* formation thereof.  See id.

The Superior Court's rationale applies with equal force to the instant leases. The addenda are unequivocal that it is SWEPI's "payment obligations," not the effectiveness or validity of the leases, which are "subject to title verification."  (Doc. 56-15 at 8; Doc. 56-16 at 8).  This language plainly conditions SWEPI's performance obligation but does not impact valid formation of the parties' lease agreements.

### B.     Contract Interpretation

The sum and substance of the parties' dispute concerns issues of contract interpretation.  The foremost consideration in interpreting contracts, including oil and gas leases, is determining the contracting parties' intent.  See Hutchinson, 519 A.2d at 389-90.  Such interpretation generally is a question of law, tasking the court to discern the respective parties' intents "as manifestly expressed" through the prism of the written agreement itself.  Willison, 637 A.2d at 982.

Pennsylvania contract interpretation principles begin with the "firmly settled" proposition that the intent of the contracting parties should be gleaned from the writing itself.  Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 92 (3d Cir. 2001) (quoting Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa.

Super. Ct. 1993)).  The court must be guided by the plain meaning of the language employed by the parties rather than their "silent intentions."  <u>Jedlicka</u>, 42 A.3d at 267.  However, when a portion of a lease is ambiguous, the court may examine extrinsic evidence to resolve the ambiguity.  <u>Hutchinson</u>, 519 A.2d at 390.

A contract is ambiguous when its terms are "reasonably susceptible of different constructions and capable of being understood in more than one sense." <u>Mason v. Range Res.-Appalachia LLC</u>, 120 F. Supp. 3d 425, 440 (W.D. Pa. 2015) (quoting <u>Kripp v. Kripp</u>, 849 A.2d 1159, 1163 (Pa. 2004)).  In determining whether ambiguity exists, courts consider the language of the contract itself, any alternate meanings proposed by the parties, and the objective evidence offered in support of the proposed constructions.  <u>See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.</u>, 619 F.2d 1001, 1011 (3d Cir. 1980).  Under Pennsylvania law, it is the court's obligation to determine whether an agreement is ambiguous.  <u>See Hutchinson</u>, 519 A.2d at 390. A court may grant summary judgment on issues of contractual interpretation if the disputed terms are "subject to only one reasonable interpretation."  <u>Emerson Radio Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 163-64 (3d Cir. 2001) (quoting <u>Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.</u>, 180 F.3d 518, 521 (3d Cir. 1999)).

When the court finds a contract to be ambiguous, it may consider extrinsic or collateral evidence to resolve the ambiguity.  <u>See Hutchinson</u>, 519 A.2d at 390. Conflicts in extrinsic evidence must be resolved by a jury.  <u>See id.</u>  Importantly, a term is not rendered ambiguous merely because the parties disagree on the proper interpretation.  <u>See Stewart v. SWEPI, LP</u>, 918 F. Supp. 2d 333, 341-42 (M.D. Pa. 2013) (quoting <u>Baney v. Eoute</u>, 784 A.2d 132, 136 (Pa. Super. Ct. 2001)).

This court has previously noted that oil and gas leases employ certain "terms unique to . . . their genre." (Doc. 31 at 11 (quoting <u>Burlew v. Talisman Energy USA Inc.</u>, 940 N.Y.S.2d 781, 786 (N.Y. Sup. Ct. 2011))). Such leases represent a property conveyance "within a highly technical and well-developed industry," such that industry concepts are necessary considerations when interpreting the leases' terms. <u>Jacobs v. CNG Transmission Corp.</u>, 332 F. Supp. 2d 759, 772 (W.D. Pa. 2004). A court should not consider the terms of such agreements in isolation, but rather must construe them "with due regard to the known characteristics" of the particularized nature of the oil and gas industry. <u>Camp Ne'er Too Late</u>, 2016 WL 2594186, at *18 (citing <u>Franklin Sugar Ref. Co. v. Howell</u>, 118 A. 109, 110 (Pa. 1922)); <u>Roe v. Chief Expl. & Dev. LLC</u>, No. 4:11-CV-816, 2013 WL 4083326, at *5 (M.D. Pa. Aug. 13, 2013) (same); <u>Good Will Hunting Club, Inc. v. Range Res., Inc.</u>, No. 4:11-CV -1152, 2012 WL 722614, at *3 (M.D. Pa. Mar. 1, 2012) (same).

An ambiguous oil and gas lease will generally be construed against its drafter, typically the lessee oil and gas company. <u>See</u>, <u>e.g.</u>, <u>Mason</u>, 120 F. Supp. 3d at 440 (citing <u>Jacobs</u>, 332 F. Supp. 2d at 773-74 & n.6; <u>Pomposini v. T.W. Phillips Gas & Oil Co.</u>, 580 A.2d 776, 778 (Pa. 1990)). This rule of construction yields when there exists sufficient extrinsic evidence to clarify the ambiguous language. <u>See</u> <u>id.</u> at 440 (citing <u>Jacobs</u>, 332 F. Supp. 2d at 774). When ambiguity renders a lease susceptible to multiple interpretations, one being "reasonable in light of industry practices" and the other being "implausible and inconsistent with" those practices, the court may narrowly construe the lease in the manner most consistent with established industry practice. <u>Jacobs</u>, 332 F. Supp. 2d at 791-92 (citing <u>Babb v. Clemensen</u>, 687

A.2d 1120, 1121-23 (Pa. Super. Ct. 1996); <u>Pomposini</u>, 580 A.2d at 778; <u>Daset Mining Corp. v. Indus. Fuels Corp.</u>, 473 A.2d 584, 592 (Pa. Super. Ct. 1984)).  Against this landscape, the court must interpret the terms of the parties' lease agreements.

### 1.   *The Leases' Essential Terms*

The parties disagree over which documents, and thus which terms, comprise their agreement.  Plaintiffs and SWEPI rely extensively on the terms of the oil and gas leases themselves, as well as the addenda thereto, and do not dispute that these documents together comprise part of the parties' contract. (Docs. 59, 62).  Terms central to the parties' dispute—the granting, surrender, and payment paragraphs—are contained within these documents.  (Docs. 56-15, 56-16).  Plaintiffs appear not to dispute that the memoranda of lease, executed on the same day as the leases and addenda, similarly form part of the parties' agreement. (<u>See</u> Doc. 59 at 14-15; Doc. 67 at 2).

SWEPI submits that the court should also consider the language of the bank drafts, issued several weeks after execution of the leases, in divining the parties' intent.[7] (<u>See</u> Doc. 62 at 5 & n.2; Doc. 72 at 3-5; <u>see</u> <u>also</u> Doc. 62 at 13 & nn. 11-12).  In particular, SWEPI encourages the court to consider the drafts' "no liability"

---

[7] In her report and recommendation, Magistrate Judge Mehalchick declined to consider the "no liability" language, finding that the "drafts were not tendered contemporaneously with the lease[s], nor even close in time," such that the court could not consider them at the preliminary Rule 12(b)(6) stage. (Doc. 31 at 8 n.3, 22 (citing <u>Kropa v. Cabot Oil & Gas Corp.</u>, 609 F. Supp. 2d 372, 376-77 (M.D. Pa. 2009))).  Judge Mehalchick nonetheless observed *arguendo* that the additional "no liability" language precludes independent action on the draft itself but does not condition—or, as SWEPI would have it, vitiate—existing obligations otherwise arising under the leases.  (<u>See</u> <u>id.</u>)

language in support of its contention that SWEPI was free to walk away from the leases without payment of the bonus consideration at any time during the ninety -day banking period.  (See Doc. 72 at 4-5).

Several instruments prepared for purposes of a single transaction may be considered together even if the instruments are executed separately and at different times.  See Sw. Energy Prod. Co. v. Forest Res., LLC, 83 A.3d 177, 187 (Pa. 2013). Crucial to this proposition is that the parties intended the instruments to constitute a single, unified contract, rather than distinct agreements.  See id.  Separate instruments intended as one agreement will often be obvious supplements to one another, either expressly by incorporation or implicitly by essential substance. See, e.g., id.; Alder Run Land, LP v. Ne. Nat. Energy LLC, No. 3:13-222, 2014 WL 1758141, at *4 (W.D. Pa. Apr. 30, 2014) (quoting Neville v. Scott, 127 A.2d 755, 757 (Pa. Super. Ct. 1956)).  Nonetheless, instruments which "do not in terms refer to each other" may be considered together when they are plainly part of a single business transaction.  Alder Run Land, LP v. Ne. Nat. Energy LLC, 622 F. App'x 164, 168 (3d Cir. 2015) (nonprecedential), aff'g Alder Run Land, LP, 2014 WL 1758141.[8]

The court agrees with SWEPI that the drafts are integral to the parties' transaction and it will consider the language of the bonus drafts in interpreting the parties' lease agreements.  Neither the leases nor the drafts expressly incorporate

---

[8] The court acknowledges that nonprecedential decisions are not binding upon federal district courts.  Citations to nonprecedential decisions herein reflect that the court has considered the panel's *ratio decidendi* and is persuaded by same.

the terms of the other, but each draft plainly refers to a corresponding lease and the property conveyed in connection therewith.  (See Docs. 56-38, 56-40, 56-44, 56-45). Moreover, the lease addenda reference payment by "Bank Draft," implicitly acknowledging that the forthcoming instruments would become part and parcel of the parties' exchange.  (See Docs. 56-15, 56-16).  Under these circumstances, the leases, addenda, memoranda, and bank drafts represent constituent parts of a single business transaction.  The court will consider all of these documents in the interpretive analysis that follows.

### 2.   *The Parties' Proposed Interpretations*

The parties offer antipodean interpretations of the lease documents and SWEPI's attendant obligations.  SWEPI maintains that its duty to pay the bonus consideration did not accrue until ninety days after plaintiffs presented the bank drafts to their respective financial institutions such that, when SWEPI surrendered the leases before expiration of the ninety-day period, it had no pending obligation to plaintiffs.  *Per contra*, plaintiffs contend that SWEPI incurred an obligation to pay the bonuses immediately upon execution of the leases, subject only to satisfactory verification of title.  Both parties submit extrinsic evidence in further support of their respective interpretations.

The court held at the Rule 12 stage that SWEPI's construction of its bonus obligation is one reasonable interpretation of the leases.  However, in denying SWEPI's motion to dismiss, the court remarked that much of SWEPI's argument rested on broad statements of industry custom regarding use of "bank drafts" and an assumption that this custom, if established, would be read into and modify the

language of the parties' leases.  (See Doc. 34 at 3 n.2).  The court also concluded that

plaintiffs' proffered interpretation—that the payment paragraph governs when, not

whether, payment is due—is objectively reasonable.  The court will now measure

the reasonableness of the parties' divergent constructions against the fully

developed Rule 56 record.

### a.   **Plaintiffs' Proposed Interpretation**

Plaintiffs' proposed interpretation derives from a literal and methodical

reading of the payment paragraph.  That paragraph comprises four sentences, the

first of which expresses assumption of an extant obligation by SWEPI, *to wit*: "In

consideration for the attached paid-up Oil and Gas Lease, [SWEPI] *agrees to pay*

Lessor: *four thousand*  and 00/100 dollars ($ *4000* .00) per net mineral acre."  (Doc.

56-15 at 8 (first emphasis added); Doc. 56-16 at 8 (first emphasis added)).  The

second sentence describes the manner, means, and deadline for payment of the

obligation incurred: "Payment shall be due within ninety (90) banking days of the

Lessor presenting the Bank Draft to the financial institution of his/her/their

choosing."  (Doc. 56-15 at 8; Doc. 56-16 at 8).  The third sentence adopts the present

tense to impose a title verification condition—"All payment obligations *are subject*

*to* title verification by Lessee."—suggesting that the obligation assumed in the first

sentence is immediate and not deferred as SWEPI posits.  (See Doc. 56-15 at 8

(emphasis added); Doc. 56-16 at 8 (emphasis added)).  The fourth sentence requires

that "[s]aid title verification shall be completed within the aforementioned ninety

(90) banking day period."  (Doc. 56-15 at 8; Doc. 56-16 at 8).  The plain language of

the payment provision supports plaintiffs' contention that SWEPI's payment obligation accrued upon execution.[9]

Plaintiffs' interpretation produces a result which is "fair, customary, and such as prudent [persons] would naturally execute."  See Jacobs, 332 F. Supp. 2d at 774 (quoting Burns Mfg. Co. v. Boehm, 356 A.2d 763, 766 n.3 (Pa. 1976)).  SWEPI concedes that the leases bound plaintiffs upon execution and instantly granted SWEPI the right to explore and develop plaintiffs' property.  (See Doc. 68 at 10 n.5). The recorded memoranda of lease state that the leases' primary term commenced on November 5, 2011.  (Docs. 56-17, 56-18).  If the leases are not read to contemplate an immediately binding payment obligation upon SWEPI, subject only to approval of title, SWEPI is free to speculate with plaintiffs' interests and possess plaintiffs' land without reciprocation.  Rules of contract interpretation counsel against such inequitable results when a competing interpretation makes the agreement both "rational and probable."  Jacobs, 332 F. Supp. 2d at 774 (quoting Boehm, 356 A.2d at 766 n.3).

SWEPI asserts that the "no liability" clause printed on the bank drafts defeats plaintiffs' proposed interpretation.  The final sentence of the bank drafts

---

[9] The court acknowledges that this analysis departs from the rationale undergirding the magistrate judge's finding of ambiguity at the Rule 12(b)(6) stage. Magistrate Judge Mehalchick focused on the parties' use of the term "Bank Draft" and commented that, under the UCC, the drafts might reasonably be construed as cash-equivalent negotiable instruments deemed paid upon tender.  (Doc. 31 at 17 -20).  Ostensibly, plaintiffs now concede that the leases and drafts are subject to a condition, such that the negotiable instrument analysis no longer applies.  (See Doc. 59 at 8 n.1).  Obviously, this does not foreclose the court's consideration of alternate constructions unexplored at the Rule 12(b)(6) stage.  (See Doc. 34 at 3 n.2).

states: "No liability for payment or otherwise shall be attached to any of the parties hereto." (Docs. 56-38, 56-40, 56-42, 56-44). As the court observed in resolving SWEPI's motion to dismiss, the "no liability" language most logically pertains to the draft itself, precluding independent litigation thereon. (See Doc. 31 at 22; see also Docs. 56-38, 56-40, 56-42, 56-44).

The majority of courts presented with this question have reached the same result. In Smith v. Arrington Oil & Gas, Inc., 664 F.3d 1208 (5th Cir. 2012), the Fifth Circuit Court of Appeals rejected a lessor's argument that "no liability" language on a draft issued contemporaneous with lease execution allowed it "to 'walk away' for any reason prior to . . . paying on the drafts." Id. at 1213-15. Instead, the panel held that Arkansas' principles of contract interpretation—which, like Pennsylvania law, task courts to "give effect" to all terms of a contract—require a construction that allows the "no liability" provision to coexist with obligations otherwise created by the underlying lease. See id. State and federal courts in Louisiana likewise have held that a "no liability" clause must be read in tandem with the leases, rather than as an escape clause from obligations arising thereunder. See Davis v. Meagher Oil & Gas Props., Inc., No. 08-1638, 2010 WL 819403, at *4 (W.D. La. Mar. 4, 2010); St. Romain v. Midas Expl., Inc., 430 So.2d 1354, 1357-58 (La. Ct. App. 1983). But see Spellman v. Lyons Petroleum, Inc., 709 S.W.2d 295, 296-98 (Tex. App. 1986).

The court finds the *ratio decidendi* of the Fifth Circuit and the Louisiana courts to be persuasive and most consistent with Pennsylvania's rules of contract interpretation. See Smith, 664 F.3d at 1213-15; Davis, 2010 WL 819403, at *4; St. Romain, 430 So.2d at 1357-58. To hold otherwise would directly contravene the

established principle that all terms of an agreement should be construed together, giving full and fair effect to each provision.  See Jacobs, 332 F. Supp. 2d at 790-91. Accordingly, the court rejects SWEPI's intimation that its inclusion of a "no liability" clause on after-issued bank drafts independently voids its obligations or unilaterally invalidates the leases.

SWEPI lastly remonstrates that plaintiffs' position regarding accrual at execution is belied by the fact that the parties subsequently agreed to reduce the leased acreage, amending the amount of bonus consideration due.  (See Doc. 68 at 15-16).  SWEPI offers no authority to support its contention that a mutual and backdated modification of an accrued obligation operates to void same.  (See id.)  As plaintiffs correctly stress in rebuttal, "it is well settled that a written agreement may be modified by a subsequent . . . agreement."  (Doc. 71 at 18 (quoting Elliott-Lewis Corp. v. York-Shipley, Inc., 94 A.2d 47, 49 (Pa. 1953))).  SWEPI's argument that modification of the drafts dissolved its payment obligation is meritless.

Plaintiffs' proposed interpretation of the addenda's payment provision is loyal to contextual language and consistent with the balance of the lease documents.  The opening sentence of the payment provision reasonably articulates a present obligation to pay bonuses, with the balance of the paragraph dictating the manner and means of payment subject to a single condition.  (Doc. 56-15 at 8; Doc. 56-16 at 8).  For these reasons, the court concludes that plaintiffs' interpretation of the lease documents—under which SWEPI could *only* refuse to honor the bonus drafts if it found a title defect—is reasonable.

b.    **SWEPI's Proposed Interpretation**

The court next turns to SWEPI's proposed interpretation of the leases, by which SWEPI contends that it could dishonor the drafts for any reason, or for no reason at all, until the ninety-day banking period expired.  (See Doc. 62 at 11-12). Beyond a summary assertion that its view "is objectively reasonable," (id. at 12), SWEPI identifies no substantive support within the lease documents themselves to suggest that its bonus obligation did not accrue immediately.  As noted *supra*, the inceptive sentence of the payment paragraph purports to create an existent obligation to remit payment of $4,000 per net mineral acre to plaintiffs, subject only to the condition of title verification.  (Doc. 56-15 at 8; Doc. 56-16 at 8).  The semantic structure of the paragraph—consisting of SWEPI's unequivocal agreement to pay and a description of the time and manner in which it must do so—simply does not support a deferred accrual theory.[10]

Nor do principles of contract interpretation strengthen SWEPI's position.  To hold that no obligation accrues until ninety days post-presentment would render other language in the leases and drafts superfluous.  Specifically, the payment paragraph provides that SWEPI's obligation to pay the bonus draft is conditioned upon "title verification."  (Doc. 56-15 at 8; Doc. 56-16 at 8).  The bank drafts as well state that the ninety-day banking period is "for title verification and for payment."

---

[10] Although the court found SWEPI's construction to be reasonable at the Rule 12(b)(6) stage of proceedings, the undersigned expressly observed that the bulk of SWEPI's theory was contingent on "broad statements of industry custom and practice which are not yet substantiated by a factual record."  (Doc. 34 at 3 n.2). The court concluded that interpretive determinations necessarily must await summary judgment.

(Docs. 56-38, 56-40, 56-42, 56-44).  This condition on payment is rendered mere surplusage by SWEPI's interpretation, under which it could purportedly dishonor the drafts for *any* reason at all.  Rules of contract interpretation counsel courts to avoid interpretations that reduce clear contract terms to superfluity.  See Jacobs, 332 F. Supp. 2d at 789-91 (citing W. Pa. Gas Co. v. George, 28 A. 1004 (Pa. 1894)).

SWEPI instead looks beyond the leases and asseverates that its position "comports with case law from Pennsylvania and other states as well as industry custom and usage."  (Doc. 62 at 13).  Courts may consider industry practice and precedent in measuring the reasonableness of a party's proposed interpretation of purportedly ambiguous contract terms.  See Camp Ne'er Too Late, 2016 WL 2594186, at *18 (citing Franklin Sugar Ref. Co., 118 A. at 110); Roe, 2013 WL 4083326, at *5 (same); Good Will Hunting Club, 2012 WL 722614, at *3 (same); see also Mellon Bank, 619 F.2d at 1013.  The party asserting that custom defines a particular contract term bears the burden of demonstrating that such custom "is notorious, well-established and reasonable."  Leslie v. Pennco, Inc., 470 A.2d 110, 113 (Pa. Super. Ct. 1983).

The court first addresses SWEPI's contention that it is "common practice in the oil and gas industry in Pennsylvania to use a bank draft for payment of the lease 'bonus,' by which the payment obligation does not accrue until the expiration of a certain time period."  (Doc. 62 at 16-17).  SWEPI cites a passage from *Williams & Meyers' Oil & Gas Law*, a leading industry treatise, as support for its position:

31

> A common practice in the oil and gas industry is for a
> lessee to give a bank draft for bonus money for execution
> of a lease.  The draft is not payable for a period of time,
> say thirty or sixty days.  The agreement or draft itself
> often indicates payment is subject to "approval of title."
> This gives the lessee the time and opportunity to check
> title to determine if it is really getting what it is paying for.
> If title is not satisfactory, the lessee can simply dishonor
> the draft and not have the burden of bringing an action
> for return of the money.  *But, the lessee also has the
> opportunity to back out of a deal if it decides the deal was
> not so good as it first appeared or if industry conditions
> have changed.*  It may be that a dry hole came in on the
> adjacent tract before the draft was presented.  Or the
> lessee may have tried to market the lease to someone else,
> and failing in that decides to dishonor the draft.  Timely
> mailing or tender of bonus money may be necessary to
> make effective or continue the effectiveness of the lease.

(Id. at 17 (quoting WILLIAMS & MEYERS, OIL AND GAS LAW § 666)).  SWEPI

highlights *Williams & Meyers'* comment that drafts allow a lessee to "back out of a

deal" for any reason at all as establishing that, solely by employing the term "bank

draft," SWEPI was able to bind plaintiffs without incurring a reciprocal obligation.

(See id.)  SWEPI's selective quotation ignores language following the above excerpt

which notes that "the language of the bonus provision" is crucial to determining

whether or when a lessee will be bound by its promise to pay.  See WILLIAMS &

MEYERS, OIL AND GAS LAW § 666.  Thus, SWEPI's selective citation to the *Williams

& Meyers* treatise does not afford the sweeping protection that SWEPI seeks.

SWEPI also directs the court to an industry law institute article, which

observes: "If the landowner wants the lease and the promise to pay the bonus to be

immediately binding, the landowner should insist on a cashier's check or company

check rather than a draft."  (Doc. 62 at 19 (quoting Jesse R. Pierce, *The Use and*

32

*Perils of Sight Drafts in Leasing Transactions*, 59 ROCKY MTN. MIN. L. INS. 28-1, § 28.03[2] (2013))).  This same authority cautions that the particular language chosen by the parties is critical in determining the existence and extent of a lessee's obligation thereunder.  See Pierce, *supra*, at §§ 28.02[2], 28.03[1].  Indeed, the Pierce article offers an equal admonition to lessees, warning that a title approval clause alone may not create an "escape valve" absent additional language permitting the lessee to void the entire transaction for any reason.  See id. at § 28.03[1].  For the best likelihood of achieving a liability-free transaction, Pierce recommends inclusion of a title verification condition, a surrender clause, *and* a caveat that, in the event lessee neither pays nor surrenders by the due date, "the Lessee shall have 5 business days from receipt of . . . written notice to make payment *or surrender the lease without any liability*."  Id. (emphasis added).  The Pierce article negates SWEPI's assertion that bank drafts *ipso facto* preclude liability otherwise accrued under a lease.

Finally, SWEPI submits affidavits executed by two of its landmen, James Ian Haney ("Haney") and Thomas Rielly ("Rielly"), as well as Pennsylvania oil and gas attorney Lisa McManus ("Attorney McManus"), as support for its argument that SWEPI was unbound by the leases and could reject the drafts for any reason.  (Doc. 61-29; Doc. 61-30; Doc. 72-1).  The Haney and Rielly affidavits confirm that it is "typical" for payment by draft to "allow[] for a period of time prior to payment" and be "conditioned on certain requirements being met," with examples of frequently used conditions including: "approval of the lease by management, review of title, approval of title, etc."  (Doc. 61-29 ¶¶ 9-12; see Doc. 61-30 ¶¶ 10-11).  This evidence is

merely consistent with the leases' statement that SWEPI's "payment obligations are subject to title verification."  (Doc. 56-15 at 8; Doc. 56-16 at 8; <u>see also</u> Docs. 56-38, 56-40, 56-42, 56-44).

Attorney McManus extends her opinion further, opining broadly that a lessee may dishonor a draft within the time for payment without liability being imposed on the lessee.  (Doc. 72-1 ¶¶ 2, 17).[11]  But Attorney McManus's discussion of the use of drafts is not as absolutory as SWEPI suggests.  Like SWEPI's landmen, Attorney McManus endorses the proposition that payment by bank draft is often "contingent upon the satisfaction of conditions."  (<u>Id.</u> ¶ 14).  In past practice, she advised her landowner clients against accepting drafts "because a draft would *generally* allow the lessee to renege on the lease by dishonoring the draft."  (<u>Id.</u> ¶ 17 (emphasis added)).  Attorney McManus also notes that, in her experience, "no protest" or "no liability" language printed on a draft provides the lessee with an unmitigated "out" from the lease without liability to fund the draft.  (<u>Id.</u> ¶ 21).  In closing, Attorney McManus observes that, based upon the language of the lease and her understanding of the risk of nonpayment associated with drafts in the industry,

---

[11] As background to her opinion, Attorney McManus makes the general observation that the Pennsylvania oil and gas industry accords distinct treatment to the term "bonus."  According to Attorney McManus, a "bonus" in Pennsylvania represents the aggregate of delay rentals that would be due under a lease's primary term, rather than a signing bonus paid for execution of the lease.  (<u>See</u> Doc. 72-1 ¶¶ 1, 15).  Attorney McManus opines that, given this distinction, a Pennsylvania oil and gas bonus is not payable upon execution and is "contingent upon the satisfaction of conditions."  (Doc. 72-1 ¶ 14; <u>see also</u> Doc. 72 at 4).  At this juncture, the parties no longer dispute that payment by draft can be conditioned, or that the drafts were in fact subject to a condition in this case.  (<u>See</u> Doc. 59 at 8 n.1).  The effect of the contractual condition, not its existence, is the matter of contention.

she "would have advised the plaintiffs that . . . this lease did not bind the lessee to pay them." (<u>Id.</u> ¶ 23; <u>see also id.</u> ¶ 24).

Attorney McManus's affidavit establishes only that payment by bank draft is often "heavily" conditioned, such that a likelihood "of loss of the lease to lessors" exists. (<u>Id.</u> ¶ 23; <u>see also id.</u> ¶ 19). To be sure, her admonitions are justified: as other industry evidence forewarns, minor modification to lease language may drastically limit, or eliminate, a lessee's obligation. <u>See</u> Pierce, *supra*, at §§ 28.02[2], 28.03[1]; Williams & Meyers, Oil and Gas Law § 666. It is the language of the leases, however, *not* the mere fact of payment by draft, which effects that result. Attorney McManus's general observations are unavailing when, as here, contracting parties adopt unique language to mitigate the risks she emphasizes. (<u>See</u> <u>generally</u> Doc. 72-1). Thus, Attorney McManus's affidavit simply reaffirms the principle delineated in *Williams & Meyers* and in the Pierce article: the precise language employed by the parties necessarily governs their respective rights and obligations. (<u>See</u> <u>id.</u> ¶¶ 2, 21).

In sum, the Rule 56 record simply does not substantiate SWEPI's Rule 12 portrayal of an industry custom whereby a lessor's agreement to accept payment by bank draft allows a lessee—in every instance, and without regard for contract language—to reject the lease and to dishonor a tendered draft for any reason. To the contrary, the bulk of SWEPI's evidence supports the opposite conclusion: careful contract draftsmanship defines when certain obligations accrue and when, or whether, a party may be relieved of those obligations. <u>See</u> Pierce, *supra*, at

§§ 28.02-03; see also WILLIAMS & MEYERS, OIL AND GAS LAW § 666.  On the issue of industry custom, SWEPI's *probata* and *allegata* are at fatal variance.

SWEPI lastly catalogues case law from within the Commonwealth and elsewhere, urging that the assemblage demonstrates widespread judicial adoption of its proposed definition of the term "bank draft."  (See Doc. 62 at 14-16; Doc. 68 at 13-14).  A cursory review of the several decisions relied on by SWEPI reveals their holdings to be inapposite.

Only one Pennsylvania case presents in a similar substantive posture.  In Mickel Drilling Partners v. Cabot Oil & Gas Corp., No. 3:11-CV-61, 2012 WL 4953081 (M.D. Pa. Oct. 16, 2012) (Caputo, J.), lessee Cabot Oil and Gas Corporation ("Cabot") executed acknowledgments of payment to plaintiffs which provided: "Subject to . . . approval of title, [Cabot] will pay, within 60 days of receipt of the subject Oil and Gas Lease, properly executed, the sum of $95,925.00, which represents the bonus consideration."  Id. at *2-3.  The parties executed leases, but within sixty days of execution, Cabot sent plaintiffs a letter terminating the agreement pursuant to a surrender clause.  Id. at *3.  In holding that Cabot was not obligated to pay the bonuses, the court observed: "Cabot . . . was not required to make the bonus payments within sixty days *unless it approved the title*.  Cabot *did not approve the title* and instead terminated the lease."  Id. at *8 (emphasis added).  Thus, Mickel Drilling stands only for the unexceptional proposition that when payment is conditioned on title verification, and title is not verified, the lessee cannot be compelled to pay the bonus.  See id.

SWEPI then directs the court's attention to two related federal district court decisions applying North Dakota law: <u>Kaufman v. Chesapeake Energy Corp.</u>, No. 1:12-CV-87, 2012 WL 4442799 (D.N.D. Sept. 25, 2012) and <u>Kuhn v. Chesapeake Energy Corp.</u>, No. 1:12-CV-86, 2012 WL 4442798 (D.N.D. Sept. 25, 2012).  In both cases, landowners alleged that the lessee breached its obligation to fund orders of payment issued as bonus consideration in exchange for oil and gas leases.  <u>See</u> <u>Kaufman</u>, 2012 WL 4442799, at *1; <u>Kuhn</u>, 2012 WL 4442798, at *1.  But the lessee's orders adopted the protective language recommended by the Pierce article: the lessee "promised to pay the bonuses within sixty days *or surrender the Lease*" without liability.  <u>See</u> <u>Kaufman</u>, 2012 WL 4442799, at *4 (emphasis added); <u>Kuhn</u>, 2012 WL 4442798, at *3-4 (emphasis added).  The court concluded that the lessee had reserved the "absolute right to surrender" without payment obligation by employing the limiting language in the lease documents.  <u>See</u> <u>Kaufman</u>, 2012 WL 4442799, at *4; <u>Kuhn</u>, 2012 WL 4442798, at *3-4.  Quite clearly, <u>Kaufman</u> and <u>Kuhn</u> are factually distinct from the instant matter.

SWEPI also cites <u>Martin v. Turner Oil & Gas Properties, Inc.</u>, No. 1:11-CV-102, 2013 WL 1183786 (D.N.D. Mar. 21, 2013).  The <u>Martin</u> court observed in *dicta* that it was "not unsympathetic with the [landowners'] argument that [the lessee] was able to bind them for a certain period of time and speculate with their interests without having paid anything.  However, this is the program that they signed up for."  <u>Id.</u> at *6 n.8.  The court further remarked that the landowners' circumstances were of their own making, and yet "another good example of why mineral owners would be well-advised to consult with an attorney" before executing an oil and gas

lease.  Id.  SWEPI's reliance on Martin is misplaced: the drafts in Martin included both management approval *and* title verification conditions, neither of which had been satisfied.  See id. at *4-6 & n.8.

Quite simply, courts have not adopted the sweeping definition of "bank draft" suggested by SWEPI.  Like SWEPI's record evidence, the decisions uniformly confirm that specific language chosen by the contracting parties dictates their respective obligations on a case-by-case basis.  See, e.g., Mickel Drilling, 2012 WL 4953081, at *8; Kaufman, 2012 WL 4442799, at *4; Kuhn, 2012 WL 4442798, at *3-4; see also Pierce, *supra*, at §§ 28.02[2], 28.03.  The court finds that neither industry custom nor case law support SWEPI's circumventive interpretation of the parties' lease agreements.[12]

---

[12] SWEPI also contends that plaintiffs' "subjective understanding" of any payment obligations arising under the lease comports with SWEPI's interpretation, such that "no other plausible interpretation exists."  (Doc. 62 at 12-13).  SWEPI mischaracterizes plaintiffs' testimony.  Masciantonio testified that he understood the surrender clause to mean that SWEPI could terminate the lease at "any time . . . without regard to me."  (Doc. 56-3, Masciantonio Dep. 203:10-204:5 (June 3, 2015)).  However, Masciantonio also explained that, although he "didn't like the surrender clause," he agreed to it based on his understanding that the clause pertained to drilling and other activities but would not impact the bonus payment.  (See id. 257:19-258:20).  SWEPI cites no evidence that Masciantonio or Latshaw understood the mere fact of payment by bank draft to mean that SWEPI could refuse to pay the bonuses for any reason or no reason at all.  The record reflects the reverse: both plaintiffs testified to their belief that SWEPI could *only* refuse payment if its title search revealed plaintiffs did not own the land, including the oil and gas rights, as warranted.  (See id. 250:17-251:11, 259:1-8, 287:1-7, 289:9-290:3, 292:2-15); Doc. 56-4, Latshaw Dep. 41:9-43:4, 44:19-25, 53:22-54:8, 103:2-5) (July 8, 2015)).

### C.     Breach of Contract

The language of the lease agreements *sub judice* is plain and unambiguous, susceptible of only one reasonable interpretation: SWEPI was bound to pay bonus consideration upon execution of the leases, subject only to the condition of title verification.  (See Doc. 56-15 at 8; Doc. 56-16 at 8).  This construction is consistent with Pennsylvania's law of contract interpretation, as well as principles of logic and fairness.  See Jacobs, 332 F. Supp. 2d at 774 (quoting Boehm, 356 A.2d at 766 n.3).  SWEPI's obligation accrued at the time of execution and survives notwithstanding SWEPI's surrender of the leases in May of 2012.  See *supra* at 26-29.  Consequently, the court is compelled to determine whether nonpayment of the drafts constitutes a breach of the parties' oil and gas leases.

Pennsylvania law requires plaintiffs pursuing a claim for breach of contract to demonstrate the existence of a contract, including its essential terms; defendant's breach of a duty imposed by those terms; and resultant damages.  See Roth v. Cabot Oil & Gas Corp., 919 F. Supp. 2d 476, 494 (M.D. Pa. 2013) (citing Omnicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004); CoreStates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  In a threefold challenge to plaintiffs' breach of contract claim, SWEPI argues that: *first*, "issues with title" prevent satisfaction of the condition precedent, (see Doc. 62 at 23-24); *second*, the frustration of purpose doctrine relieves its duty to perform, (see Doc. 72 at 6 n.7); and *third*, with respect to the Latshaw Trust, the Latshaws failed to provide notice of default as required by the lease, limiting recovery to the Masciantonios alone, (see id. at 24 n.14).

1.     *Condition Precedent to Performance*

It is undisputed that SWEPI's obligation to pay the bonus consideration is conditioned upon "title verification by [SWEPI]." (Doc. 56-15 at 8; Doc. 56-16 at 8). The fourth sentence of the payment paragraph outlines SWEPI's obligation in this regard: "Said title verification shall be completed within the aforementioned ninety (90) banking day period." (Doc. 56-15 at 8; Doc. 56-16 at 8). Hence, the payment paragraph accomplishes two objectives: (1) it conditions SWEPI's duty to fund the presented drafts on verification of title and (2) it places an affirmative obligation on SWEPI to accomplish title verification within ninety banking days. [13] (See Doc. 56-15 at 8; Doc. 56-16 at 8). The parties dispute the meaning of "title verification" in debating the scope of the condition precedent. (See Doc. 62 at 23-24; Doc. 67 at 12; Doc. 72 at 10).

SWEPI asserts broadly that "the only evidence of record about the reason(s) for surrender is that title was the reason." (Doc. 62 at 23-24). SWEPI presents no evidence tending to show that plaintiffs' respective title interests are defective or otherwise invalid. (See id.) SWEPI contends that it decided to surrender the leases because certain tracts of land adjoining the southern border of plaintiffs'

---

[13] To the extent SWEPI suggests that its obligation to confirm title was discretionary, such that SWEPI could wantonly refuse to investigate plaintiffs' title and dishonor the drafts on that basis, its argument is controverted by the plain language of the payment provision, which requires that title verification "*shall* be completed" within the stated time period. (Doc. 56-15 at 8 (emphasis added); Doc. 56-16 at 8 (emphasis added)). Of the courts to have reached this question, the majority hold that the lessee is obligated to undertake some investigation in order to refuse payment under a title approval clause. See Pierce, *supra*, at § 28.02[2] (collecting cases).

property were already leased to competitors and a geohazard exists in the northern portion of plaintiffs' property.  (See id.)  SWEPI relies exclusively on its senior land representative, attorney Benjamin Irwin ("Attorney Irwin"), to support its position that geology and competition are permissible bases to dishonor the drafts.  (Doc. 68 at 16-19).  Attorney Irwin avers that the phrase "*title examination*" in the oil and gas industry encompasses not only verification of a lessor's title to the leased property, but also examination of "the surrounding parcels to determine whether SWEPI is able to put together enough contiguous acreage so as to be able to develop the target formation."  (Doc. 68-3 ¶¶ 6-8).  Plaintiffs rejoin that "*title verification*" can only be fairly construed to mean verification of plaintiffs' title to the property that plaintiffs intend to lease.  (Doc. 67 at 21).

The court notes as a threshold matter that SWEPI's Rule 56 materials all pertain to the phrase "title examination" rather than "title verification."  (See Doc. 68 at 16-19; Doc. 68-3 ¶¶ 6-8; Doc. 72 at 11).  This distinction alone compels rejection of SWEPI's arguments, as SWEPI does not endeavor to establish that the phrase "title verification" encompasses the sweeping and discretionary considerations enumerated in its land representative's definition of "title examination."  (See Doc. 68-3 ¶¶ 6-8).  Consequently, the Rule 56 evidence offers SWEPI no support.

Nor does SWEPI's strained definition of "title verification" find foothold elsewhere.  The dictionary definition of both terms plainly supports the narrow construction proposed by plaintiffs.  "Verification" is defined as "the state of being verified," or "the act or process of verifying," with its root "verify" being defined as "to prove, show, find out, or state that (something) is true or correct."  MERRIAM-

Webster's Collegiate Dictionary (11th ed. 2009).  Title, in turn, is defined as "the legal link between a person who owns property and the property itself."  Black's Law Dictionary (10th ed. 2014).  And "good title," as warranted in plaintiffs' leases, is that which is "legally valid or effective," "clear," or "marketable."  Id.  The plain language of the condition precedent, *per definitionem*, directs SWEPI to measure the existence and the state of plaintiffs' title to the property leased.[14]

The language of the leases does not suggest that the parties intended to broaden the phrase "title verification" to include a review of title to neighboring properties or an assessment of the geology underlying plaintiffs' land.  Industry case law reveals that, when lessees impose such additional contingencies on bonus payment, they do so intentionally and unambiguously, with such language as: "subject to . . . inspection, approval of the surface, geology and title," Cardinale, 74 A.3d at 141, or "subject to . . . approval of title and . . . management approval of the lease," Valentino v. Range Res-Appalachia, LLC, No. 09-1615, 2010 WL 2034550, at *2, 5-6 (W.D. Pa. May 21, 2010).  The court declines to retrospectively expand the language chosen by SWEPI's draftsmen to effectively include such geology and approval clauses.

---

[14] SWEPI summarily contends that a narrow view of "title verification" builds surplusage into the leases because a person cannot convey what they do not own. (Doc. 68 at 16-17).  This contention is without merit.  The precondition authorizes SWEPI to consider both ownership and the state of plaintiffs' title, to include determining whether the title is free and clear of encumbrances and defects.

SWEPI's claim that "title verification" includes elements beyond plaintiffs' own title is unsupported by law, fact, or reason.[15]   The court concludes that SWEPI could only dishonor the drafts for reasons related to plaintiffs' title, either a lack thereof or defects therein.   As a consequence, the Rule 56 inquiry narrows considerably: the court must determine whether genuine disputes of material fact remain concerning SWEPI's efforts to verify plaintiffs' title and the results thereof.   As the party claiming breach, plaintiffs bear the burden of proving satisfaction of the precondition.   See McDermott v. Party City Corp., 11 F. Supp. 2d 612, 620-21 (E.D. Pa. 1998) (citing Mellon Bank, 619 F.2d at 1007-08).

Plaintiffs produce abundant proof of title in support of their claim.   The record contains deeds for each of the subject properties in plaintiffs' names, the authenticity of which SWEPI does not appear to dispute.   (Docs. 56-10, 56-11; see also Doc. 43 ¶ 8; Doc. 45 ¶ 8).   Masciantonio thoroughly traced the history of the deeds through several generations of his wife's family during his deposition.   (Doc. 56-3, Masciantonio Dep. 22:21-25:3).   In its answer to plaintiffs' amended complaint, SWEPI admits that plaintiffs own the subject property and the oil and gas rights thereto.   (Doc. 43 ¶ 7; Doc. 45 ¶ 7).   SWEPI's Rule 56 papers attempt to reclaim its admission based on the parties' agreed acreage reduction, but the record is devoid of evidence to support SWEPI's insinuation that plaintiffs' title may be defective or

---

[15] Plaintiffs also suggest that SWEPI's interpretation of the title verification condition is inconsistent with the covenant of good faith and fair dealing, which plaintiffs argue must be read into every oil and gas lease.   (See Doc. 67 at 15-19). The court has held that the plain language of the condition controls this dispute and that SWEPI's expanded interpretation thereof is unreasonable as a matter of law.   Hence, the court does not determine whether the covenant of good faith and fair dealing applies to Pennsylvania oil and gas leases.

invalid.  (See Doc. 69 ¶ 9).  To be clear, the court finds that there are no disputed facts concerning plaintiffs' title to the leased property.

Moreover, the evidence concerning SWEPI's title verification efforts reflects that SWEPI did in fact review and verify plaintiffs' title.  SWEPI acknowledges that those efforts led to an agreed downward reduction in acreage for the second-issued bank drafts to reflect acreage amounts coinciding with plaintiffs' "verifiable title." (Doc. 61 ¶ 108; see Doc. 56-3, Masciantonio Dep. 277:21-278:6).  SWEPI avers that it discovered the geohazard and neighboring competitor acreage in the course of "perform[ing] its obligations under the Bonus Provision of the Lease to verify title." (See Doc. 62 at 23-24; Doc. 69 ¶ 98).  These concessions defeat SWEPI's *sub silentio* intimation that verification did not occur.

SWEPI does not so much as allege that plaintiffs' title was defective in explaining its reasons for dishonoring the drafts.  (See Doc. 62 at 23-24; Doc. 68; see also Doc. 45 ¶ 7).  Stockwell, testifying on SWEPI's behalf, made no reference to plaintiffs' title or any lack thereof when discussing SWEPI's reasons for surrender of the leases; instead, Stockwell identified the apparent geohazard and competitor ownership of adjacent tracts as the *exclusive* reasons for surrender.  (See Doc. 56-8, Stockwell Dep. 24:8-25:6, 28:7-30:12).  When asked directly by plaintiffs' counsel, Stockwell testified that he does not recall title issues being part of his surrender calculus whatsoever.  (Id. 65:23-66:7).

The record contains a dearth of evidence from which a trier of fact could reasonably conclude that plaintiffs' title is defective or that SWEPI dishonored plaintiffs' bonus drafts as a result of those defects.  SWEPI could surrender the

leases at any time and for any reason, but SWEPI could only dishonor the bonus drafts if it found title to be invalid or defective.  SWEPI fails to demonstrate any genuine dispute for trial in response to plaintiffs' ample evidence in satisfaction of the title verification condition.  On this record, plaintiffs are contractually entitled to the bonus payments contemplated by the leases.[16]

### 2.   *Notice of Default*

In a cursory final salvo, SWEPI argues that the Latshaws failure to provide pre-suit notice of default is fatal to their breach of contract claim.  (Doc. 62 at 24 n.14; Doc. 72 at 11).  The leases each contain a default provision, as follows: "No default shall be declared against the Lessee for failure to make payments . . . unless

---

[16] Inasmuch as SWEPI sees fit to perfunctorily raise the defense of frustration of purpose for the first time in a reply brief footnote, the court responds in kind.  (See Doc. 72 at 6 n.7).  A party generally may not raise an affirmative defense for the first time in a reply brief at the Rule 56 stage.  See, e.g., Kenepp v. Am. Edwards Labs., 859 F. Supp. 809, 816 (E.D. Pa. 1994) (citing Kleinknecht v. Gettysburg Coll., 989 F.2d 1360, 1374 (3d Cir. 1993)).  The court rejects SWEPI's defense for this reason.  In the exercise of caution, the court also rejects SWEPI's frustration defense as wholly without merit.  SWEPI characterizes the singular purpose of the parties' leases as "commercially-viable development of natural gas" and suggests that this purpose was entirely and unpredictably foreclosed by a geohazard running through the northern portion of the property and an inability to acquire competitor-owned leases to the south.  (See Doc. 72 at 6 n.7).  This tortured construction is refuted by the leases' language, which envisages both exploration for and development of oil and gas.  (See Doc. 56-15 at 1; Doc. 56-16 at 1).  Pennsylvania courts apply the frustration of purpose doctrine "sparingly."  IMAX Corp. v. Capital Ctr., No. 1:15-CV-378, 2016 WL 108045, at *5, __ F. Supp. 3d __ (M.D. Pa. 2016).  It will operate to void a contractual obligation only when an unexpected, intervening event occurs after execution of the contract that substantially frustrates its purpose.  See id.  It is not enough to invoke the doctrine that a transaction "has become less profitable . . . or even that [a party] will sustain a loss."  Hiriam Hicks, Inc. v. Synagro WWT, LLC, 867 F. Supp. 2d 676, 698-99 (E.D. Pa. 2012) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 265 comment a).  SWEPI submits no evidence to establish that it did not know or could not have known of the potential presence of geohazards on plaintiffs' property or competitor-owned leases in the vicinity before executing the leases in November of 2011.  (Doc. 72 at 6 n.7).

the Lessee shall refuse or neglect to pay or perform the same for sixty (60) days after having received written notice from Lessor."  (Doc. 56-15 at 3; Doc. 56-16 at 3). The addenda, which the parties agree "supersede the printed terms of the lease," contain a similar notice requirement:

> If Lessee violates, fails to perform, or breaches any material terms, covenants, or conditions in this lease, Lessor shall notify Lessee in writing of such violation, failure, or breach. Lessee shall have a period of sixty (60) days from the date of its receipt of Lessor's written notice, in which to remedy the material violation, failure, or breach.  If Lessee fails or refuses to remedy the material violation, failure, or breach within the prescribed time period, Lessor may, at its sole option, terminate this Lease as to all of the lease premises.

Doc. 56-15 at 7; Doc. 56-16 at 7).  SWEPI contends that the Masciantonios' letter demanding payment of the bonus consideration is insufficient to put SWEPI on notice of the Latshaw plaintiffs' separate but related claim.  (See Doc. 62 at 24 n.14).

At the outset, the court rejects SWEPI's assertion that "no facts in the record" establish that the Latshaws authorized Masciantonio to act on behalf of their Trust.  (Doc. 72 at 12).  This position is inconsistent with SWEPI's admission that Masciantonio "acted on behalf of and as the principal point of contact" for all plaintiffs concerning the leases.  (Doc. 58 ¶ 3; Doc. 69 ¶ 3).  SWEPI itself states that Masciantonio "served as the main point of contact for" plaintiffs in their dealings with SWEPI.  (Doc. 61 ¶ 45).  Indeed, Masciantonio gave his deposition testimony in this case on behalf of *both* the Masciantonios and the Latshaw Trust, with no apparent objection from SWEPI.  (See Masciantonio Dep. 12:17-16:8).  The unequivocal Rule 56 record establishes that Masciantonio acted on behalf of all plaintiffs in matters concerning the subject leases.

Alternatively, SWEPI's surrender of the leases defeats the provenance and substance of the notice requirement.  Such provisions aim to provide the party purportedly in default with an opportunity to cure before the non-defaulting party can bring suit to invalidate a lease.  See, e.g., Linder v. SWEPI, LP, 549 F. App'x 104, 108 (3d Cir. 2013) (nonprecedential); McWreath v. Range Res.-Appalachia, LLC, 81 F. Supp. 3d 448, 472 (W.D. Pa. 2015).  In the instant case, SWEPI's simultaneous surrender and breach nullified the notice provision itself and vitiated its purpose.  SWEPI's failure to respond to Masciantonio's demand letter reveals that SWEPI, too, considered the notice provision and any responsive obligation to be a nullity upon surrender.  The court declines SWEPI's final entreaty to immunize it from proven contractual liability.

## IV.   Conclusion

Established principles of contract interpretation resolve this dispute.  Upon execution of the lease documents, SWEPI accrued an extant obligation to pay bonus consideration of $4,000 per acre to plaintiffs in exchange for SWEPI's reciprocally immediate right to explore and to develop plaintiffs' subsurface estate.  (Doc. 56-15 at 1, 8; Doc. 56-16 at 1, 8).  The lease language conditions this obligation on "title verification" alone.  (Doc. 56-15 at 8; Doc. 56-16 at 8).  Uncontroverted record evidence establishes that the Masciantonios and the Latshaw Trust jointly hold title to the subsurface estate, in satisfaction of the condition precedent, and that SWEPI dishonored the drafts for reasons entirely unrelated to title.  See supra at 39-45.  The court holds that there is no genuine dispute that SWEPI breached its contractual obligation to plaintiffs.

The court will grant plaintiffs' motion (Doc. 57) and deny SWEPI's motion (Doc. 60) pursuant to Federal Rule of Civil Procedure 56.[17]  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:       July 15, 2016

---

[17] Plaintiffs' fraudulent inducement claim in Count II is raised in the alternative.  (Doc. 67 at 22).  In light of the court's disposition of plaintiffs' breach of contract claim, the court will dismiss plaintiffs' fraudulent inducement claim.